**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | |
|---|---|
| **HEAVEN HILL DISTILLERIES, INC.** | **PLAINTIFF** |
| **v.** | **No. 3:21-cv-190-BJB-CHL** |
| **LOG STILL DISTILLING, LLC** | **DEFENDANT** |

\* \* \* \* \*

<u>**OPINION & ORDER**</u>

*"Storytelling is everything."*

– Log Still marketing team

## I.    Two Distillers, One Story

During the 19th century, pioneering Kentucky distillers like Jacob Beam, Elijah Craig, E.H. Taylor, Jr., and Robert Samuels transformed frontier whiskey into what we now know as bourbon, "the only spirit distinctive to the United States." S. Res. No. 110-294, 153 CONG. REC. S10822 (2007).  Their legacies include iconic bourbons branded with their names even today.

Among their ranks is Joseph Washington "J.W." Dant, who in 1836—at age 16—began distilling bourbon in an unusual way: he poured it through a hollowed poplar log.  From those humble roots, he and his many children started their own successful brand bearing his name.  It still exists.  But today J.W. Dant bourbon is distilled and sold rather more conventionally by Heaven Hill, another family-owned distillery that acquired the brand decades after the Dant family sold it.

Seventy-five years after that sale, J.W.'s great-great-great-grandson John Wallace "Wally" Dant III and some of his cousins set out to "restore" their family's place in Kentucky bourbon history by building a new distillery, line of spirits, and tourist destination.  "Log Still Distilling," founded in 2018 and named after J.W.'s original method of distilling, produces its Monk's Road bourbon and gin at the "Dant Crossing" campus in Nelson County—the site of a shuttered distillery where previous generations of Dants lived and worked.

If the new venture had stopped there, it might not have spent its early years before the Patent and Trademark Office and U.S. District Court.  But Log Still decided to "subtly [tie] the new distillery to the J.W. Dant name."  Plaintiff's Exhibit

1

(PX) 25 at 3. Its website describes a "heritage" and "Dant Legacy" revived by Log Still "one barrel at a time." PX 16 at 1. "Our story," the website asserts, "begins with our forefather Joseph Washington Dant," who "gave birth to the Dant family's place in bourbon lore with a legacy all our own." *Id.* Now the "rebirth of the J.W. Dant legacy" is marked by "the latest generation of Dant distillers." PX 27 at 11. "[W]e're the Dant family," social media proclaimed, "and we're back in the bourbon business." PX 34 at 15.

This is not strictly accurate: the J.W. Dant brand of bourbon and spirits never left. The Dant Distillery Company, founded in 1870, sold the J.W. Dant brand, trademarks, and goodwill in 1943. Heaven Hill acquired them in 1993. Now Log Still is utilizing the J.W. Dant name in a manner that has confused consumers regarding the relationship between the two brands—and is likely to cause more confusion in the future. By trading on the goodwill associated with the story of Joseph Washington Dant and his 19th century log, today's Dants and their 21st-century Log Still threaten Heaven Hill with irreparable harm to the control of its brand and trademarks.

Log Still Distilling offers attractive products wrapped in a compelling story. But that story is associated with Heaven Hill's bourbon, not Log Still's—and Log Still knew this when it set out to "subtly" tie the two together. PX 25 at 3. Federal trademark law bars Log Still from using these trademarks and goodwill to sell spirits that compete with the J.W. Dant brand sold off long ago by an earlier generation. The new generation may distill its own bourbon and promote its own brand, but not by executing a marketing strategy that leverages the old brand. That would infringe Heaven Hill's marks. And the record at this early stage contains more than enough evidence to conclude Heaven Hill will likely prevail on the merits of its infringement claim and suffer irreparable harm in the meantime, entitling it to a preliminary injunction.

## II.    The Two Brands[1]

### A. J.W. Dant

**1. The Dant Distillery Company.** Joseph Washington Dant began distilling whiskey in 1836 by "running it on a log." According to the family legend, he ran a copper pipe through a hollow log, filled the pipe with fermented mash, and passed steam through the pipe. Hearing Testimony of Wally Dant, Tr. Vol. I (DN 60) at 262; Hearing Testimony of Bernie Lubbers, Tr. Vol. I at 191. In 1870, J.W. Dant built a distillery called The Dant Distillery Company, Inc., which produced J.W. Dant-

---

[1] This section sets forth factual findings, based on the briefing and hearing, consistent with Federal Rule of Civil Procedure 52. Additional findings also appear in Section III's legal analysis.

branded whiskey. *Id*. J.W. Dant fathered seven sons, all of whom worked in the distilling industry. Dant, Tr. Vol. II (DN 62) at 106–7; Defense Exhibit (DX) 26 at 1.

In 1902 J.W. Dant passed away, leaving a will asking that "no whiskey subsequently made be branded with my name." *John P. Dant Distillery Co. v. Schenley Distillers, Inc.*, 189 F. Supp. 821, 824 (W.D. Ky. 1960), *aff'd*, 297 F.2d 935 (6th Cir. 1962). Perhaps the patriarch anticipated some of his family's subsequent legal squabbles.[2] Rather than stop production, however, J.W.'s son George W. Dant became president of The Dant Distillery and continued to produce J.W. Dant bourbon. *Id*. After Prohibition, the distillery obtained two different J.W. Dant trademarks:




---

[2] Three such squabbles are worth noting:

*First*, J.W.'s grandson—William Dant—opened Dant & Head Distillery on the current site of Dant Crossing. PX 24; Dant, Tr. I at 276; Dant, Tr. II at 110, 152. The Dant Distillery Company, led by William's uncle George, successfully sued Dant & Head for infringing on J.W. Dant's trademarks. *Id*

*Second*, another son of J.W.—John P. Dant—started The John P. Dant Distillery Company, which produced Old Ballard and Old Danton bourbons and did business with The Dant Distillery. *John P. Dant Distillery*, 189 F. Supp. at 823, 825; DX 24; Dant, Tr. II at 109. After Schenley Distillers bought the Dant Distillery Company in 1953, it sued the John P. Dant Distillery for trademark infringement in 1955. 189 F. Supp. at 823; PX 1. The district court acknowledged that Schenley owned the J.W. Dant marks, but denied recovery on estoppel grounds: the John P. Dant Distillery had used the Dant name for a long time and carried on substantial business with the Dant Distillery Company before Schenley bought it. 189 F. Supp. at 824, 827.

*Third*, still another son of Joseph Washington—"J.B."—opened the Cold Spring Distillery in Gethsemane, Kentucky, which produced Yellowstone bourbon. Dant, Tr. II at 106–10; DX 26 at 109. The current incarnation of Yellowstone discusses J.W. Dant's legacy today, and does so without objection from Heaven Hill. Now Log Still, like John P. Dant in the 1950s, contends this estops Heaven Hill from complaining about Log Still's use of the name and story. *See* § III.B.

*Id.*; *see* U.S. Reg. No. 320,981 (issued January 15, 1935); U.S. Reg. No. 376,057 (issued March 12, 1940).

The brand and its trademarks changed hands several times in the mid-20th century, a period when most of the Dants left the distilling industry. Hearing Testimony of Max Shapira, Tr. Vol. I at 65–66, 139–40; Dant, Tr. I at 263–64, 276; PX 24. After George W. Dant died in 1943, United Distillers of America purchased the Dant Distillery and all its assets. *John P. Dant Distillery*, 189 F. Supp. at 824. Schenley Distillers bought the Dant Distillery in 1953. *Id.* at 823; PX 1 at 1–2. Guinness purchased Schenley in 1987. Shapira, Tr. I at 66. And Heaven Hill bought the J.W. Dant brand and many larger labels in a $30 million 1993 transaction. PX 2; Shapira, Tr. I at 138. The transaction conveyed the two original J.W. Dant trademarks shown above, a mark for the words "J.W. Dant" registered in the 1960s, *see* U.S. Reg. No. 874,828, and a common-law trademark for "The Dant Distillery Company," which is registered in Kentucky, *see* PX 2 at 9; PX 52.

**2. Heaven Hill.** This large family-owned distilling company produces many high-volume brands including Evan Williams, Elijah Craig, and Old Fitzgerald. *See* Shapira, Tr. I at 54–58. It also continues to produce J.W. Dant, a far smaller label that offers a bourbon, vodka, gin, blended whiskey, and more. Shapira, Tr. I at 65–70; PX 5. Since 2004, J.W. Dant sales and revenues have declined by more than half. PX 5 at 1; Shapira, Tr. I at 84–88, 155–56. But Heaven Hill has revived other historical brands, like Old Fitzgerald, and if conditions allow, contends it could do the same with J.W. Dant. Shapira, Tr. I at 55–58, 122–23.



**J.W. Dant bourbon**

Bargain-hunters may find J.W. Dant bourbon for $15 to $18 on the bottom shelf of liquor stores in most states. Shapira, Tr. I at 70–71; PX 6 at 11. Heaven Hill doesn't feature J.W. Dant among the 19 bourbons that appear on its website, and spends next to nothing to market the label—less than $12,000 over 16 *years* for all J.W. Dant liquors, compared to the millions it spends each year to market the rest of

its products.  PX 5 at 1; Shapira, Tr. I at 67, 159–62, 166; DX 29.  More than 65,000 annual visitors to Heaven Hill's current distillery and tourism center in Bardstown might read about J.W. Dant—but only on a small poster in a corner.  *See* Shapira, Tr. I at 77; PX 4 at 2.  Heaven Hill's new visitor center—opened in 2021—presents J.W. Dant only somewhat more prominently, alongside other bottled-in-bond labels.  PX 4 at 4; Shapira, Tr. I at 78–80.  And J.W. Dant appears in some of the distillery's tasting programs.  Shapira, Tr. I at 78–81, 150–53.  The visitor center sells the bourbon on site, but offers no J.W. Dant merchandise.  *Id*. at 81, 150–53.

Based on this price point, sales volume, and advertising, Log Still contends the once-proud brand has deteriorated on Heaven Hill's watch.  Log Still Opposition Brief (DN 37) at 17.  According to Log Still's expert, only 2.1% of bourbon consumers recognized the J.W. Dant logo mark—far less than many other brands.  DX 59 at 17–19.  This study, though hardly bulletproof according to Heaven Hill's rebuttal expert, at least corroborates what Heaven Hill's own sales and marketing numbers tell us: J.W. Dant is a relatively small brand in a hot and crowded bourbon market.  *Id*.  Indeed, Dant sales comprise less than 1% of Heaven Hill's sales today, even though other "bottled-in-bond" brands represent a larger (and growing) share of the company's sales.  Shapira, Tr. I at 156–57.

Heaven Hill draws a very different conclusion, however: this small brand sells itself.  And at an attractive profit margin.  Rather than spending on ads, Heaven Hill sells to existing customers without needing to prompt them.  Shapira, Tr. I at 67; *see, e.g.*, PX 6 (newspaper articles on J.W. Dant products); Lubbers, Tr. I at 196–201.  The brand remains recognized and desirable to its loyal customer base, which "pulls" the bottles off the shelf without any advertising stimulus.  And the company promotes J.W. Dant bourbon as part of its Bottled-in-Bond Certified-Premises program at liquor stores in Indiana and Kentucky, as well as in some advertisements.  PX 6; Shapira, Tr. I at 67, 163; Lubbers, Tr. I at 192–95, 228.



**Heaven Hill's Bottled-in-Bond Certified-Premises Display
(Motion for Preliminary Injunction (DN 4) at 9)**

### B. Log Still

In 2018 several of J.W. Dant's descendants—Wally Dant III, Lynne E. Dant, and Charles Douglas Dant—founded Log Still Distilling, Inc., which now goes by Log Still Distillery. PX 24 at 1–2; Dant, Tr. I at 260:3–7. They purchased the former site of the Dant & Head distillery (by then a mothballed wooden-truss factory) in Gethsemane, Kentucky and invested millions in a new distillery, bottling operation, rickhouse, and massive campus that they named Dant Crossing. PX 24 at 2; Dant, Tr. I at 260–62; Tr. II at 44. It opened in 2021. Log Still also recently began selling bourbon and gin in liquor stores around Kentucky under the Monk's Road brand. Dant, Tr. I at 279:2–14; Tr. II at 62:14–21.

These entrepreneurs knew their family's name remained a part of the bourbon trade today. But Wally Dant thought he and his cousins "could do better with" the brand than Heaven Hill had. PX 24 at 1–2, 35. In the spring of 2019, Wally Dant twice met with Max Shapira, the president of Heaven Hill, to discuss purchasing the J.W. Dant brand. Shapira said Heaven Hill valued the brand and would not sell it, though he was willing to consider a joint venture or licensing agreement. Shapira, Tr. I at 98–101; Dant, Tr. I at 265; PX 7.

But Wally Dant still wanted a name that "related to the history of the family," including J.W. Dant. PX 24 at 2. So the distillery's marketing team developed the name Log Still: given its relationship to Joseph Washington "running it on a log" back in 1836, the concept "create[d] a perfectly positioned name for building brand equity in the family history & subtly tying the new distillery to the J.W. Dant name." PX 25 at 1. The name, they concluded, "creates direct ties to the J.W. Dant name whether the brand can be used or not." *Id.* The new distillery's name, logos, branding, social

6

media, and marketing strategies all invoke these themes: "reviving a legacy," "heritage revived," and "reviving the Legacy one barrel at a time."  *See* PX 24 at 2; PX 27 at 7–8; PX 32 at 10; PX 48 at 4–7.

While developing this campaign, the marketing team used J.W. Dant marks—such as the font and color of the J.W. Dant logo, the year 1836, and the circular kernel logo—as reference points for Log Still's potential marks.  PX 22; PX 24 at 10; PX 28. Not all these design ideas made the final cut, to be sure.  And while the current Log Still logos might be influenced or inspired by the Dant marks, they are not just knock-offs.

 

**Log Still and J.W. Dant marks**



**18-D-36 Crest and D-A-N-T Kernels logos**

Log Still's website was less "subtl[e]."  PX 25 at 3 (Log Still Brand Strategy Brief at 1).  To start, the company obtained the URL jwdant.com and (until this litigation) used it to redirect traffic to the Log Still website.  Dant, Tr. II at 21–23; PX 30 at 1–2.  Wally Dant testified that this did, or at least could, refer to his initials rather than Joseph Washington Dant's.  Dant, Tr. II at 136.  This strains credulity. His cousin and Log Still's head distiller Lynne Dant apparently didn't read the initials that way: "speaking of our ol' great-great J.W.," she remarked in an email thread discussing Joseph Washington, "I believe we now own the URL

JWDant.com…since we keep mentioning the name, can we go ahead and map that URL to logstilldistillery.com?"  PX 30 at 3.  Indeed they did.

What did readers find when they reached logstilldistillery.com?



**Images from Log Still's website (PX 16 at 1–2)**

- "Our story begins with our forefather Joseph Washington Dant," who "gave birth to the Dant family's place in bourbon lore with a legacy all our own.  In 1836 he started a story of heritage and Kentucky bourbon has flowed through our family's veins ever since."  PX 16.
- "Reviving the Dant Legacy one Barrel at a time." *Id.*
- "Heritage Revived."  *Id.*
- "[S]even generations later, we're building something new."  *Id.*
- "And because family is at the heart of what we do, we view every bottle as a nod of respect to the past.  Log Still is Wally Dant's tribute to his father, forefathers and their contribution to bourbon history."  *Id.*

Log Still's social media posts on Facebook and Instagram (PX 33–34; Germain Supplemental Report (DN 30-7)) were still more explicit in connecting the new and old brands:

- It's "time to tell you a little story about reviving a legacy." PX 33 (6/14/21).
- "We owe the bourbon in our blood to him, as we work to revive a legacy, one generation at a time."  *Id.* (6/17/21).
- A "legacy all our own" that was "celebrating the past" and "giving a toast to the future." *Id.* (6/19/21).

Three posts (PX 33–34; DN 30-7 at 3) even feature the actual trademarked J.W. Dant logo and bottles.





What about Log Still's actual products?  Today, at many fine establishments in Kentucky, or at Log Still's Dant Crossing campus, you can pick up Log Still's Monk's Road bourbon for $80 or grab two varieties of gin for around $30 each.  Dant, Tr. II at 128:6–16.  These stout square bottles display the same tagline: "[t]his is a story of heritage & revival."  PX 17.  The labels go on to assert that "Joseph Washington Dant started *this tradition* way back *in 1836* when he felled a poplar tree."  *Id.* (emphases added).  That is of course not literally true, at least not unless we adopt such a broad interpretation of "this tradition" that it would encompass and connect both Dant Distillery and Log Still Distillery—the sort of unwarranted affiliation that trademark law exists to prevent.  *See* below at § III.A(3).  Yet the bottles double down on this stylized story by also presenting the "18-D-36" crest logo and a date: "est. 1836."  PX 17; Hearing Testimony of Tim Earnhart, Tr. Vol. II at 174, 199; Dant, Tr. II at 44.



Dant Crossing is the name Log Still gave its 350-acre campus, which includes a lake, trails, an amphitheater for concerts, a bed-and-breakfast, a restaurant, and the Log Still distillery.  Earnhart, Tr. II at 174:10–24, 180–81; Dant, Tr. II at 64–66, 71; PX 14 at 1–2, 16.  The name fuses several Dant family connections: the Dant & Head distillery sat there, J.W. Dant was produced there, and several Dants lived on the land.  Dant, Tr. I at 260–62; Dant, Tr. II at 116–18.  And the "Crossing" echoes the railroad that did and will pass through the property.  *Id*.  The campus—about 10 miles from Heaven Hill's visitor center—also fuses the Dant Crossing and Log Still brands.  PX 14; Shapira, Tr. I at 80–81; Earnhart, Tr. II at 174, 180–81; PXs 38, 40, 44–46.  A story board discusses the history of J.W. Dant and Log Still, for example, and the tasting room is walled by barrels stenciled with "The Dant Distillery Company," a common-law trademark registered to Heaven Hill.  PXs 41–43; PX 52 at 29.  This campus already receives a large number of visitors, and the crowds will only increase as Log Still expands and joins the Kentucky Bourbon Trail Craft Tour.  Dant, Tr. I at 279:23–80:8, Tr. II at 74:7–15, 82:21–83:25, 116–18; PX 24 at 7–8; PX 48 at 21; PX 53 (submission for Craft Tour guide).

## C. Legal Proceedings

Log Still and its marketing team have long been aware that many of their actions could lead to "threats" such as "legal challenges" from Heaven Hill.  PX 24 at 7; PX 26 at 1.

They were right.  In response to social-media posts, Heaven Hill sent three cease-and-desist letters to Log Still.  PXs 8, 12, 13.  Heaven Hill also challenged Log Still's attempts to trademark Dant & Head before the Trademark Trial and Appeal Board.  PX 9.  This caused Log Still to abandon the petition and the Board to find for

Heaven Hill.  *Id.*, Ex. B at 3.  Log Still maintains it attempted to comply with Heaven Hill's demands.  Dant, Tr. II at 144.  But Heaven Hill nevertheless sued for trademark infringement and unfair competition.  "If we let the control of our brand, the control of the history[,] and heritage of our brand slip away," the president testified, then "we're really in real danger of losing control over the entire brand."  Shapira, Tr. I at 127:18–21.

Heaven Hill also asked the Court to preliminarily enjoin Log Still from using the Dant name "in connection" with spirits and order it to remove several logos, posts, and more.  DN 4, attachment 8.  After expedited discovery and briefing, the parties presented evidence and argument at a two-day hearing.  The companies offered testimony from their presidents and marketing employees, as well as written reports from three dueling experts.  DN 55; Tr. II at 3–7.[3]

## III.   Heaven Hill's Entitlement to a Preliminary Injunction

A preliminary-injunction request requires a court to consider "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction."  *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (quotation omitted).  "[T]he existence of an irreparable injury is mandatory," *D.T. v. Sumner County Schools*, 942 F.3d 324, 327 (6th Cir. 2019), and likelihood of success on the merits often proves determinative, *see, e.g.*, *Online Merchants Guild v. Cameron*, 995 F.3d 540, 560 (6th Cir. 2021); *Safex Found., Inc. v. Safeth, Ltd.*, 531 F. Supp. 3d 285, 297 (D.D.C. 2021); 15 U.S.C. § 1116(a) (irreparable harm presumptively follows a showing that trademark infringement is likely).  "The proof required for a plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion because a preliminary injunction is an extraordinary remedy."  *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012) (quotation omitted).  But the procedural and evidentiary rules are relaxed compared to a trial, so a party "is not required to prove his case in full at a preliminary-injunction hearing."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

### A. Likelihood of success on the merits

Likelihood of success in a trademark-infringement case turns on whether the defendant's actions would likely cause consumer confusion.  A trademark is "any

---

[3] Log Still moved to exclude Heaven Hill's expert Kenneth Germain because he only offered legal opinions.  DN 30 at 2.  During a brief hearing regarding the logistics of the preliminary-injunction hearing, DN 50, the Court denied Log Still's motion to exclude Germain's expert reports (DN 30-6 and -7), with the understanding that the Court would only rely on their factual testimony, not any legal opinions they discussed.  *See also* Tr. II at 4.

word, name, symbol, or device ... used by a person ... to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127.  To support an infringement claim under the Lanham Act, a plaintiff must show that:

1. it owns the registered trademark,
2. the defendant used the mark in commerce, and
3. the use was likely to cause confusion.

*Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (citing 15 U.S.C. § 1114(1)).

### 1.  Trademark Ownership: Heaven Hill owns and uses valid J.W. Dant trademarks

Heaven Hill owns four trademarks at issue: two J.W. Dant images, one J.W. Dant word mark, and one for "The Dant Distillery Company."  PX 52 at 29.  The Dant Distillery Co. assigned all trademarks and "good will" associated with the J.W. Dant brand to Schenley in 1953.  PX 1 at 1, 2.  When Heaven Hill purchased the brand in 1993, it acquired all these trademarks and associated "goodwill."  PX 2 §§ 1.1–1.2.

Log Still raises two arguments against Heaven Hill's ownership of the three "J.W. Dant" marks, and their ongoing validity.  Neither finds support in law or fact.

*First*, Log Still argues that Heaven Hill has allowed the quality and sales of J.W. Dant to fall so far that the brand has lost its associated goodwill, leaving nothing for other users to infringe.  LS Opp. Br. at 27–30.  But Log Still cites no law for the contention that changes in a product's quality or market position could surrender its trademark protections.  Abandonment, perhaps the legal concept most analogous to Log Still's position, requires "both non-use and intent not to resume use."  *Yellowbook Inc. v. Brandeberry*, 708 F.3d 837, 848 (6th Cir. 2013).  Neither is apparent here. Although the J.W. Dant recipe has changed, its sales have declined, and the brand was sold as part of a much larger transaction, none of that shows the brand's goodwill has evaporated entirely.  PX 5; Shapira, Tr. I at 138–40.

To the contrary, the J.W. Dant marks are incontestably valid.  A trademark is "incontestable" if it is registered and continuously used in commerce for five or more years without challenge.  *See* 15 U.S.C. § 1065.  This serves as "conclusive evidence of the validity of the registered mark."  § 1115(b).  Three Dant marks are registered with U.S. Patent and Trademark Office, as shown by affidavits approved by the PTO Director.  15 U.S.C. § 1065(3); PX 52.  Heaven Hill has continuously used those marks in commerce by selling the J.W. Dant brand without challenge.  Shapira, Tr. I at 65–70.  And the same is true of their predecessors in interest.  *Id.* at 65–66, 139–40; Dant, Tr. I at 263–64.  Heaven Hill also registered a valid common-law trademark—for "The

Dant Distillery Company"—with the Kentucky Secretary of State in 1993, PX 52 at 29, a mark whose validity Log Still doesn't appear to contest.

*Second*, Log Still speculates that Heaven Hill may not have lawfully acquired the brand. LS Opp. Br. at 27–28. J.W. Dant's will allegedly requested that the brand no longer continue under his name after his death, for one. *Id.* at 27. And Heaven Hill has not convinced Log Still that it can trace its purchase back to The Dant Distillery, for another. *Id.* at 27–28. This is hard to swallow: a judicial decision in this district and the president of Log Still agree that The Dant Distillery produced J.W. Dant long after the death of J.W. Dant and then sold the rights to Schenley in the 1950s. *John P. Dant Distillery*, 189 F. Supp. at 823–24; PXs 1—2, 52 (collecting mark ownership and registration information); Dant, Tr. I at 263–64. From that point forward, no one seriously contests the transactional chain leading to Heaven Hill.

Given the evidence that the trademarks at issue are incontestably valid and were lawfully acquired—and the dearth of contrary evidence—Heaven Hill has established its ownership and control of the trademarks at issue.

## 2.  Trademark Use: Log Still uses Heaven Hill's J.W. Dant marks to identify its own commercial products

**a.  Use of a mark.**  Is Log Still "using the challenged mark in a way that identifies the source of [its] goods"? *Hensley Mfg.*, 579 F.3d at 610. The Sixth Circuit's "trademark use test" asks whether the defendant is using the mark to commercially identify products, or just to describe them in a noncommercial manner. *Id.* Referring to a name, location, or set of ingredients that accurately describe an association or objective fact about a product, for instance, amounts to permissible non-trademark "descriptive" use under (admittedly idiosyncratic) Sixth Circuit caselaw. *See Sazerac Brands, LLC v. Peristyle, LLC*, 892 F.3d 853, 859 (6th Cir. 2018) (acknowledging out-of-circuit critiques).[4]

---

[4] The Lanham Act codifies a similar doctrine for descriptive uses—but casts it as the affirmative defense of "fair use." 15 U.S.C. § 1115(b)(4). Fair use requires the defendant to "(i) use the label in a descriptive or geographic sense and (ii) do so fairly and in good faith." *Sazerac*, 892 F.3d at 857. The Sixth Circuit has noted that the trademark-use test and fair-use defense have "little daylight between" them, as both focus on the descriptiveness of the mark's use. *Id.* at 859. But the trademark-use test places the burden on the plaintiff and does not require the defendant to show good faith. *Id.* Whether the analysis here is framed as trademark use or instead as fair use, as Log Still also suggests, LS Opp. Br. at 24, the question (and answer) remain the same: is Log Still using J.W. Dant's marks and goodwill to identify the source of its goods? Yes, it is. Moreover, Log Still has not provided evidence that it acted "fairly and in good faith." *Sazerac*, 892 F.3d at 857–60. In fact, the evidence shows the opposite. *See* § III.A(3)(g) below. Even if the Sixth Circuit's trademark-use standard didn't apply, therefore, Log Still likely couldn't sustain a good-faith defense. *See, e.g.*, *Kelly–*

Log Still is using J.W. Dant, his story, and the date 1836 to sell products and reap goodwill associated with the J.W. Dant brand. *See, e.g.*, *National Distillers Products Corp. v. K. Taylor Distilling Co.*, 31 F. Supp. 611, 614 (E.D. Ky. 1940). As shown by the evidence discussed above, Log Still adopted a marketing plan to use the legacy and even images of J.W. Dant bourbon and the historic Dant Distillery Company to market Log Still's new spirits. Wally Dant and his cousins are not teachers, documentary filmmakers, or bourbon critics who might fairly use the J.W. Dant name in a non-trademark way. They are investors and entrepreneurs who used J.W. Dant to introduce a new line of spirits to the commercial marketplace.

**b. Use of a name.** But does the law allow Heaven Hill to exclusively control the commercial use of the name J.W. Dant? LS Opp. Br. at 22–27. Today it does. The law protects trademarked names, and the history and legacy of the J.W. Dant name is wrapped up in the goodwill associated with the J.W. Dant brand. "When," as here, "a name is used as a trademark, it risks becoming a symbol of the corporation and its past accomplishments and losing its individual identity." *Levitt Corp. v. Levitt*, 593 F.2d 463, 468 (2d Cir. 1979); *see also* 2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 2:17 (5th ed. 2017). So subsequent ("junior") users of the J.W. Dant name and history in the bourbon industry may not use that name and story in a way that is likely to cause confusion with existing ("senior") users.

A century ago, J.W. (Wally) Dant may have had a stronger case to sell bourbon by using his ancestor's name or the initials they share. 19th-century courts recognized a "sacred right" to use one's own name as a mark, even if someone else used the name first. 2 MCCARTHY § 13:7; *Basile, S.p.A. v. Basile*, 899 F.2d 35, 38–39 (D.C. Cir. 1990). This made sense in a localized and personalized economy in which consumers' limited access to information made a seller's reputation an important signifier of quality. "Brown's Iron Tonic" did not infringe on "Brown's Iron Bitters" as of 1891, for example, because the Supreme Court held it "hardly necessary to say that an ordinary surname cannot be appropriated as a trade-mark by any one person as against others of the same name, who are using it for a legitimate purpose." *Brown Chemical Co. v. Meyer*, 139 U.S. 540, 542 (1891) (Brown, J.).

Courts eventually recognized, however, that names could confuse as easily as any other trademark. *See L.E. Waterman Co. v. Modern Pen Co.*, 235 U.S. 88, 94 (1914). "The name of a person or a town may have become so associated with a particular product that the mere attaching of that name to a similar product, without more, would have all effect of a falsehood." *Herring-Hall-Marvin Safe Co. v. Hall's Safe Co.*, 208 U.S. 554, 559 (1908). Although an "absolute prohibition against using the name would carry trademarks too far," courts held, often "the solution was to explain one's lack of an affiliation with the senior mark or to use differentiating initials." *See id*. at 560 (requiring family that sold a famous safe company to disclaim

---

*Brown v. Winfrey*, 717 F.3d 295, 305–13 (2d Cir. 2013); *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 168–70 (4th Cir. 2012).

association with the original company); *L.E. Waterman Co.*, 235 U.S. at 94–96 (requiring defendant to use full name and a disclaimer).

Today courts show even less solicitude to personal names. *See Basile*, 899 F.2d at 39–40. For better or worse, business names are increasingly associated with products and brands on a national and depersonalized scale. *Id.* Like any other trademark, a "junior user's right to use his name thus must yield to the extent its exercise causes confusion with the senior user's mark." *Id.* at 39. So "any residual protection of the second comer's use of his own name" receives more attention as a matter of remedy rather than infringement, according to "the more general principle that an equitable remedy should be no broader than necessary to correct the wrong." *Id.*; *see also Soltex Polymer Corp. v. Fortex Indus., Inc.*, 832 F.2d 1325, 1329–30 (2d Cir. 1987); *LFP IP, LLC v. Hustler Cincinnati, Inc.*, 810 F.3d 424, 427 (6th Cir. 2016) ("the scope of the injunction accounts for the reality that the mark relates to the offending party's own last name.").

**c. Goodwill associated with a trademark.** Setting aside Log Still's use of the name J.W. Dant, however, may Log Still use the *goodwill* associated with the J.W. Dant trademarks in the liquor marketplace? The Supreme Court has characterized goodwill as "the expectancy of continued patronage," or the "total of all the imponderable qualities that attract customers to the business." *Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 555–56 (1993) (describing subscriber goodwill for tax purposes) (quotation omitted). And trademarks embody goodwill— the "expectation of continued business"— in the "minds of the buying public." 2 McCarthy § 2:17.

Junior users' actions that claim another organization's "history as their own" implicate "the goodwill of the marks they are prohibited from using." *vonRosenberg v. Lawrence*, 429 F. Supp. 3d 175, 184–85 (D.S.C. 2019). The well-reasoned decision in *vonRosenberg* addressed trademark goodwill in the context of a church schism. A portion of a diocese left to form new parishes under a new name. But they used marks controlled by the legacy church. *Id.* The "Disassociated Diocese" said it was "[f]ounded in 1785," the date of the original church's establishment. Even though the new parishes could trace their roots to that common history, the court held they had unlawfully attempted to claim the history and thus goodwill of the original church. *Id.* at 184. In other words, some connections to that legacy didn't authorize the junior user to claim that legacy, given the senior user's ownership of the relevant trademark. Likewise, "[o]nce a business sells its goodwill and trademarks," "the prior owner may no longer refer to the history of the business in attempts to market competing products." *Francis S. Denney, Inc. v. I.S. Laboratories*, 758 F. Supp. 140, 145 (S.D.N.Y. 1990). And if the infringing party "previously sold his business, including use of his name and its goodwill," then "sweeping injunctive relief is … tolerable." *Levitt Corp.,* 593 F.2d at 468.

**d. Log Still uses J.W. Dant marks to market its products and Dant Crossing.** This caselaw addressing trademark use and goodwill reveals another, broader point: this case's fact pattern is not that unusual.  In this cycle,

- Owners sell (or executives depart) a company, leaving behind its goodwill and trademarks;

- They re-enter the market by founding a company or joining a competitor;

- They try to boost the new venture by emphasizing their connections to the old one;

- The incumbent company—still in business—objects to someone else trading on its goodwill.  *See, e.g., Levitt*, 593 F.2d at 468–69; *K. Taylor*, 31 F. Supp. at 613–14; *Denney*, 758 F. Supp. at 142–43.

That's basically what happened here, though the events transpired across three centuries and seven generations.  The original J.W. Dant built a brand that rested in part on his role and reputation in Kentucky's early days as a bourbon hotbed.  His sons and grandsons continued in the business, occasionally fighting for control of the family name and marks.  *See* n.2 above (discussing *John P. Dant Distillery*, 189 F. Supp. at 822–24, and other disputes).  Eventually the family sold the J.W. Dant brand to a conglomerate, which purchased the label in part for its goodwill in the marketplace.  PX 1 at 1–2 (transferring "good will" and other assets to the buyer of the Dant Distillery Company); PX 2 at §§ 1.1–1.2 (similar).  Later still, subsequent generations sought to get back in the game—and to compete by leveraging the family's story.  Log Still and Heaven Hill both value the story associated with this "iconic, historic" brand, and both believe that story will help sell bourbon.  *See, e.g.*, Shapira, Tr. I at 56–58; PX 35 at 1–2 (Wally Dant interview).

Stories and history matter for many brands, but especially for bourbons, whose consumers respond to the traditions and founders of "America's Native Spirit."  S. Res. No. 110-294, 153 CONG. REC. S10822 (2007).  "Distillers compete intensely on flavor, but also through branding and marketing; the history of bourbon … illustrates why strong branding and differentiation is important in the distilled spirits market."  *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 415 (6th Cir. 2012).  Log Still's marketing team was and is well aware of this, emphasizing to Log Still's leadership that "storytelling is everything."  PX 32 at 20.  So the team developed a "Master Brand Name Recommendation" for "Log Still."  PX 25 at 3.  The name is clever and attractive, for reasons readily apparent to those who learn the Dant story: it "creates a perfectly positioned name for *building brand equity* in the family history & *subtly tying the new distillery to the J.W. Dant name.*  This name creates *direct ties* to the J.W. Dant name *whether the brand can be used or not.*"  *Id.* (brand strategy brief) (emphasis added).  The brand equity is consumer recognition and goodwill, which the team is trying to build by tying the "new distillery," through its name, brand, and story, "to the J.W. Dant name."  *Id.*  Log Still's marketing plan used the history of J.W. Dant and his rustic 19th-century distilling methods to frame a new

21st-century distillery concept in a "heritage revived," "one barrel at a time."  PX 24 at 5; PX 27 at 14; PX 32 at 10; PX 48 at 2,7.

Context and text alike make clear that Log Still is "reviving the Legacy" of J.W. Dant—and doing so in order to launch a competing distillery.  In most contexts, such as the bottle labels, Log Still expressly refers to Joseph Washington Dant.  *See, e.g.,* PX 28 at 2 (Wally Dant asking to use Joseph Washington instead of J.W., but the initials highlighted gold).  To the extent Log Still now argues that some mentions of Dant refer primarily to the founders' shared family surname, *see* LS Opp. Br. at 24–25 ("discussion of the historical connection between Joseph Washington Dant and Log Still's founders that share the last name"), context indicates otherwise.  Even if an innocent or ambiguous explanation might apply to a few generic references to "Dant," those would be overwhelmed by surrounding references specific to the legacy of Joseph Washington Dant.  Marketing material shows his Mosaic visage, his frontier story, and his role in the industry's founding.  Log Still proudly presents this legacy in a manner reminiscent of other Kentucky bourbon forefathers: Beam, Craig, Crow, Taylor, Van Winkle, Williams, and the like.  Log Still devotes little attention to any other Dant ancestor.  *See, e.g.*, PX 24 at 2; PX 27 at 11; PX 32 at 11; PX 48 at 2–3 (all focusing on Joseph Washington Dant).

Nor can the Court credit the notion that mentions of "J.W. Dant" predominantly refer to Log Still founder John Wallace "Wally" Dant, rather than the Dant Distillery Company founder Joseph Washington Dant.  *See* LS Opp. Br. at 24–25 ("Log Still owner John Wallace Dant III's use of his own name and signature"); Dant, Tr. II at 45–46, 136.  References to J.W. Dant appear throughout Log Still's marketing.  But its brand strategy used the old "J.W." in a manner that distinguished him from the younger entrepreneur: "The rebirth of the J.W. Dant legacy with the latest generation of Dant distillers."  PX 27 at 11.  This continued into the concept deck, which surmises that "J.W. Dant" would not believe the "impact his original Log Still would have in the year 2020."  PX 32 at 11.  Obviously the "legacy" being "revive[d]" is Joseph Washington's, not Wally's.  *Id.*  And even if we assume many of the uses might refer to Wally, the question is not Log Still's intent but consumers' understanding.  Businesspeople do not enjoy a "sacred right" to use their names in a manner that could confuse consumers of trademarked products.  *See* § III.A(2)(b); *Levitt*, 593 F.2d at 467–68.

Log Still plainly states that its "products are built from [Joseph Washington's] story.  From ideals of [our] forefathers."  PX 27 at 8.  The thrust of its plan to build a brand was to "revive," "follow," and connect to the "legacy" and "heritage" of J.W. Dant.  PX 24 at 2; PX 27 at 11; PX 32 at 11; PX 48 at 2–3.  This is not merely describing history or a family connection; it is appropriating the goodwill of an existing brand.  Log Still refers to the J.W. Dant marks in a trademark sense—"in a way that identifies the source of [its] goods," not just in a descriptive sense to accurately describe names, locations, and history associated with the products.  *Hensley*, 579 F.3d at 610–11.  Although many of the statements discussed in this litigation, if read

narrowly and literally, refer to J.W. Dant's history (and not to the spirits that bear his name today), the record indicates that Log Still's principal motivation is to sell its competing spirits and tourist offerings—not simply to reminisce about family history.

These themes didn't remain confined to a marketing pitch. Today they appear throughout Log Still's website, which Log Still uses to identify its distillery and products with J.W. Dant's legacy.







**Images from Log Still's website discussing J.W. Dant (PX 16 at 1–2)**

Log Still's social media posts on Facebook and Instagram show the same consistent trademark use. *See* PXs 33–34. Many of the posts reflect the material on the website and themes presented in the concept decks. Three of the posts even feature the J.W. Dant logo or bottles. The first shows a group surrounding the actual J.W. Dant mark.



The second shows two executives from Schenley—ironically, the company that purchased J.W. Dant from United Distillers—with a bottle of the J.W. Dant-labeled bourbon that Heaven Hill sells today. PX 34 at 7; Dant, Tr. II at 30–31.



Log Still's Facebook page also posted a set of old pictures showing packages and bottles of J.W. Dant.  Germain Supplemental Report (DN 30-7 at 3); *see also* PX 13 at 1–3 (cease-and-desist letter citing examples of Log Still posts with J.W. Dant bottles).



So when Log Still said it was "time to tell you a little story about reviving a legacy," that obviously referred to J.W. Dant's legacy.  PXs 33–34 (collecting Facebook and Instagram posts).  Other posts recalled similar themes described in the marketing plans and on the website.  One included a picture of J.W. Dant and read "we owe the bourbon in our blood to him, as we work to revive a legacy, one generation at a time."  *Id.*  Another referred to "our forefather," a "legacy all our own," "celebrating the past," and "giving a toast to the future."  *Id.*  The only point of all this is to tie the launch of the new distillery to the history and legacy of the old one in order to sell spirits and attract tourists.




**OUR STORY BEGINS WITH JOSEPH WASHINGTON DANT AND AN OLD HOLLOWED OUT POPLAR LOG.**

JOSEPH WASHINGTON DANT

**OUR FOREFATHER FASHIONED A STILL AND GAVE BIRTH TO THE DANT FAMILY'S PLACE IN BOURBON LORE WITH A LEGACY ALL OUR OWN.**

**IN 1836, A STORY OF HERITAGE BEGAN, AND KENTUCHY BOURBON HAS FLOWED THROUGH OUR FAMILY'S VEINS EVER SINCE.**

**SEVEN GENERATIONS LATER, WE'RE STILL FOLLOWING IN JOSEPH WASHINGTON'S FOOTSTEPS.**

**TO MAKE OUR LONG, LONG STORY SHORT, WE'RE THE DANT FAMILY AND WE'RE BACK IN THE BOURBON BUSINESS.**

**Assorted Log Still Instagram posts (PX 34)**

And these messages point to another, independent, reason why Log Still cannot pass off its marketing as permissible "descriptive" use: the content is inaccurate. Accuracy is inherent in the caselaw's discussion of good-faith and non-trademark use; a word or mark cannot fairly describe something unless it does so correctly. *See Sazerac*, 892 F.3d at 859 (Peristyle accurately described the location of its distillery as "The Old Taylor Distillery"). At times Log Still's descriptions of its association with the Dant history is simply wrong. One potential tagline it workshopped, for example, said it has been "putting barrels in bottles since 1836. Sorta." PX 27 at 45. But Log Still has only been in business since 2018, and can't trace its history to 1836 without co-opting the Dant Distillery Company's story. The "forefather Joseph Washington Dant," to be sure, "gave birth to the Dant family's place in bourbon lore," as Log Still explains. PX 16 at 2. But Log Still cannot fairly say that his "legacy" is "all our own" given that previous Dants alienated those rights. *Id*. Log Still's "story" does not in fact "begi[n] with Joseph Washington Dant and an old hollowed out poplar log." PX 34 at 1. Its "story of heritage" did not "beg[i]n" "in 1836" and has not "flowed through [the] family's veins ever since." *Id*. at 9. It is not the successor-in-interest to the J.W. Dant brand of distilling; Heaven Hill is. So to the extent Log Still uses the year 1836 and a connection to J.W. Dant's legacy to write

the company's own backstory, the inaccuracies in that tale cannot be considered a descriptive use at all.

**e. Caselaw confirms this view.**   One of the Sixth Circuit's leading trademark-use decisions also involved a dispute over rights to a name and place steeped in bourbon lore.  Colonel E.H. Taylor crafted the modern bourbon industry by mixing traditional distilling with innovative marketing, finance, quality control, and lobbying.  *See Sazerac*, 892 F.3d at 855.  By the 2000s, the Sazerac distilling conglomerate controlled the E.H. Taylor trademarks and continued to produce bourbons under that name.  *Id*. at 856.  But in 2014, two entrepreneurs formed Peristyle LLC and bought the tumbling-down distillery Colonel Taylor had built outside Frankfort (in the style of an ancient European castle) back in 1887.  *Id*. at 855.  While Peristyle renovated the building, and before renaming it for the new "Castle & Key" label, "the company regularly referred to the location as 'the former Old Taylor Distillery'" or simply 'Old Taylor.'"  *Id*. at 856.  After Sazerac protested, the Sixth Circuit held this was not trademark infringement because it was not trademark use:

> Peristyle used the Old Taylor name in a descriptive and geographic manner.  It referred to Old Taylor to pinpoint the historic location where Peristyle planned to make a new bourbon, not to brand that bourbon.  Keep in mind that Peristyle has not begun selling its bourbon.  It won't hit the shelves for four years. When it does hit the shelves, the bourbon will be called Castle & Key and Peristyle does not plan to put "Old Taylor" on the bottle.

*Id*. at 857.

Despite Log Still's embrace of the *Sazerac* ruling, however, the Sixth Circuit's decision is distinguishable in all the wrong ways.  Log Still's use of J.W. Dant is neither "descriptive" nor "geographic."  *Id*.  Dant & Head, not the Dant Distillery Company, distilled on the site Log Still now calls Dant Crossing.  Log Still does not refer to J.W. Dant to pinpoint a historic location, but to brand its new bourbon.  Log Still's bourbon and gin are already on the shelves, and nothing suggests the spirits' branding is temporary.  Although those bottles are named Monk's Road, their labels feature Joseph Washington Dant's 1836 origin story.

22



**Monk's Road Label – Back (PX 17 at 3)[5]**

This case bears a closer family resemblance to another Taylor distilling dispute whose result is less helpful to Log Still: *National Distillers Products Corp. v. K. Taylor Distilling Co.*, 31 F. Supp. 611 (E.D. Ky. 1940). The aforementioned E.H. Taylor

---

[5] Unlike the label shown here, the label eventually used on Monk's Road bottles sold to the public did not highlight the J, W, and Dant in the manner seen in this exhibit. This label reflects an earlier version used by the marketing department. But the text remained the same.

eventually sold the distilling company he founded with his sons. *Id.* at 612–13. Then one of the sons joined a different distillery, which changed its name to K. Taylor. *Id.* at 614. The new company's pamphlets described its "Taylor-Made Whiskies," included pictures of E.H. Taylor, and connected his quality and history to the new brand. *Id.* at 614–15. This showed "a deliberate purpose and design on the part of the defendant to secure the benefit of the good will and reputation" associated with the E.H. Taylor brand, and thereby to confuse the public. *Id.* at 615. While the labels were visually "dissimilar," the Taylor family name was by then so associated with E.H. Taylor that adding a K and other differences failed to prevent confusion. *Id.* Even during that earlier era, in which courts gave proprietors broader latitude to use their own names in the marketplace, *see* § II.A(2)(b) above, the K. Taylor company improperly "convey[ed] to the public the impression that defendant was the successor to E. H. Taylor," and did so without any disclaimer. *Id.* at 616. The Sixth Circuit later recognized that placing the name Taylor on a bottle did not helpfully describe some aspect of the product for consumers; it just helped sell the product:

> What descriptive value did adding "Kenner Taylor" to a bottle of bourbon provide to the consumer? None. It served only to dupe the public into thinking that Kenner Taylor bourbon was a successor to Old Taylor bourbon. That's quintessential use as a trademark and quintessential exploitation of the Taylor brand's goodwill.

*Sazerac*, 892 F.3d at 857–58. In contrast with this misleading use of the Taylor name, the Sixth Circuit recognized that Peristyle's decision to call the Old Taylor Distillery by its historical name *did* convey accurate information in good faith. *Id.*

Like K. Taylor, however, Log Still is impermissibly tying its brand to ancestral history associated with a famous brand it does not own. *Id.* at 857. Its products are plastered with references to J.W. Dant and his history. Take their labels. They begin with the same tagline: "this is a story of heritage & revival." PX 17 at 3. Whose heritage? "Joseph Washington Dant started *this tradition* way back in 1836 when he felled a poplar tree." *Id.* (emphasis added). But J.W. Dant obviously did not start Log Still in 1836; Wally Dant did in 2018. Yet the label proclaims that "[s]even generations later, the Dant family continues to follow in his storied footsteps." *Id.* "[O]ur bourbon won't distill too far from the tree," the label states, explicitly tying Log Still's own bourbon to the legacy of J.W. Dant. *Id.* And Log Still's 18-D-36 crest combines an image of a hollow log, an 1836 establishment date, and the first initial of the Dant name—all of which more strongly and accurately connote Heaven Hill's J.W. Dant label, not Log Still's Monk's Road spirits.



**18-D-36 Crest (LS Opp. Br. at 11)**

These references to J.W. Dant's name and history may help sell bourbon and gin, but they add no relevant (or even accurate) descriptive information for consumers. *See Sazerac*, 892 F.3d at 857. The only reason for Log Still to mention 1836 is to connect Log Still's current products to the legacy of J.W. Dant that Log Still does not own. That is "quintessential use as a trademark." *Id.* at 858; *see also vonRosenberg*, 429 F. Supp. 3d at 184–85 ("Founded in 1785" was used to claim the history and thus goodwill of the original church the junior user broke away from, and violated the senior user's trademark despite their "shared 228-year history").



**Monk's Road Label – Gin (PX 17 at 2)**

Relying on *Hensley*, 579 F.3d at 610, Log Still argues that the Dants can use their last name and family associations freely in a non-trademark manner. LS Opp. Br. at 23. In *Hensley*, an inventor named Jim Hensley developed a hitch called the "Hensley Arrow" while working for Hensley Manufacturing. 579 F.3d at 607. He then left, invented a new hitch, and marketed it as "Jim's new design." *Id.* at 607–08. The new company, ProPride, explained Jim Hensley's story, his expertise, and his lack of affiliation with his former company and the hitch that bore his name. *Id.* at 608. The Sixth Circuit rejected the resulting infringement claim because the new company didn't use Hensley as a mark to identify any product or its source, but only to explain the accurate factual connection between Hensley's product and expertise. *Id.* at 610–12. This was non-trademark (or fair) use.

Log Still, by contrast, is not using J.W. Dant to describe a factual historical association, or even to emphasize Wally Dant's own name, but instead to mark its products in a manner that connotes the history of Joseph Washington Dant. Unlike Mr. Hensley, the current Dants lack their own distilling expertise, display limited

disclaimers (when they use them at all),[6] and had no roles at Heaven Hill they might need to distinguish.  Dant, Tr. I at 277–78; PX 24 at 2–3, 5.  And they're not advertising with their own names, like Jim Hensley did; they're using J.W. Dant's name and legacy.

Compare the far more analogous trademark-use holding in *Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, an alcohol-trademark case that involved Taylors *other than* the Colonel.  569 F.2d 731, 733–34 (2d Cir. 1978).  There the Second Circuit upheld an injunction that barred a vintner from using his own last name and family history to compete with Taylor Wine, a company that bought the winery the defendant's grandfather started a century earlier.  *Id.*  The wine labels said the new winery was founded in 1878, displayed the grandfather's name ("Walter S. Taylor"), dubbed the grandfather the "Owner of the Taylor Family Estate," and displayed the grandson's signature.  *Id.*  The Second Circuit acknowledged the newcomer's own name and expertise, but held he must "take reasonable precautions to prevent [a] mistake" when his family member's "name has acquired a secondary meaning in the marketplace."  *Id.* at 734 (quotation omitted).  "[T]hat an alleged infringer has previously sold his business with its goodwill to the plaintiff," in the Court's view, "makes a sweeping injunction more tolerable."  *Id.* at 735.  The younger Taylor could use his signature to show his association with the brand—so long as he disclaimed any association with Taylor Wine—because he was a known expert in the field.  *Id.* at 736.  Connecting his brand to his grandfather's by using words like "original," however, could sow confusion and infringe.  *Id.*

The facts in this case, of course, are nearly identical—even down to the use of a century's-old founding date.  Except the current Dants have no apparent expertise in the industry to accurately characterize for consumers.  And their bottles display J.W. Dant's name, not just their own.  *See Bertolli USA, Inc. v. Filippo Bertolli Fine Foods, Ltd.*, 662 F. Supp. 203, 206–07 (S.D.N.Y. 1987) (rejecting a disclaimer of the sort used in *Taylor* because the defendants' connection to the name was purely familial and unrelated to their role in the industry); *Browne-Vintners Co. v. Nat'l Distillers & Chem. Corp.*, 151 F. Supp. 595, 605 (S.D.N.Y. 1957) (wine company could not use proprietor's real name, which grandfather had used, because a different champagne label had the right to use the name).

**f. Log Still also uses Dant Crossing in a trademark manner.**  The "Dant Crossing" name Log Still assigned its distillery, concert hall, and tourist destination presents a closer question.  As far as the record reveals, no one has ever called this

---

[6] The record reflects a disclaimer from Log Still's website (but not its bottles, distillery, or advertising) stating that "Log Still Distillery does not own the J.W. Dant bourbon brand and has no affiliation with the brand or its current owner."  But the text was so small that Wally Dant and Max Shapira both struggled to read it as presented at the hearing.  Dant, Tr. II at 153; Shapira, Tr. I at 116.  Log Still also points to a handful of Twitter and Instagram posts that promoted the quality of its bourbon using photos of J.W. Dant-branded bottles accompanied by the same disclaimer.  DN 37-17 at 9–14.

location (or any other) by this name, unlike in *Sazerac*, 892 F.3d at 857. But several Dants lived there, a distillery named Dant & Head stood there, other Dant distilleries were nearby, and a railroad crossing passed through the property. Dant, Tr. II at 116–18. So the name is somewhat descriptive.

But its use is also clearly commercial. Log Still has trademarked Dant Crossing and is treating it as a trademark. LS Opp. Br. at 25 (effectively admitting trademark use, but not infringement, regarding Dant Crossing); Dant, Tr. II at 141–42; U.S. Trademark Application Serial No. 90256626 (filed Oct. 15, 2020). The Dant Crossing and Log Still names are often used to co-brand the distillery, tours, and products. Dant, Tr. II at 141; PXs 38, 40, 44–46. Even the tissue paper and bags in the distillery's gift shop display Dant Crossing logos. PX 44 at 2. When visitors come to Dant Crossing for a tour or tasting, a storyboard shows a picture of J.W. Dant and claims this "all started with a log still," which embodies a "legacy" and "tenets the Dants still hold to this very day." PX 43 at 2. Or visitors hear from their guides about 1836, when "The Dant Family's Legacy Begins." PX 42 at 3.



By announcing "[w]e're back," PX 42 at 2, Log Still is plainly connecting its current commercial enterprise at Dant Crossing to the J.W. Dant legacy. And it is using Dant Crossing to identify numerous products and amenities that Log Still offers consumers. Even if Log Still used the Dant Crossing name accurately, it would still be using the name in a trademark way to sell its spirits and attract tourism. *Contra Sazerac*, 892 F.3d at 858–59 (distillery name was used to accurately describe a known location, not to promote "commercial activities at the distillery").

\* \* \*

This is not to say that Heaven Hill has the exclusive right to mention J.W. Dant. Log Still (like anyone else) could discuss this history in a descriptive manner.

But any such retelling could not advertise spirits. So Log Still may discuss the family connection between its owners and Joseph Washington Dant. But it may not use the story of J.W. Dant or Dant Distillery Company to identify or advertise its current products and venture. *See Denney*, 758 F. Supp. at 145 (defendant "may no longer refer to the history of the business in attempts to market competing products."). Currently Log Still does just that when it connects the old J.W. Dant name and legacy to the new distillery and products. *See* PX 27 at 7–8; PX 48 at 2–3; PX 16 at 1–2. The current record plainly supports a finding of trademark use.

### 3. Likelihood of confusion

The remaining question, then, is whether Log Still's trademark use is likely to create confusion among consumers. As the evidence at this stage shows, it has and likely will. To make that determination, the Sixth Circuit's *Frisch's* test asks the fact-finder to consider 8 factors:

> a. strength of the plaintiff's mark;
>
> b. relatedness of the goods;
>
> c. similarity of the marks;
>
> d. evidence of actual confusion;
>
> e. marketing channels used;
>
> f. likely degree of purchaser care;
>
> g. defendant's intent in selecting the mark;
>
> h. likelihood of expansion of the product lines.

*Frisch's Rest., Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1264 (6th Cir. 1985).

"These factors are simply a guide," the Court of Appeals has explained, "to help determine whether confusion would be likely to result from simultaneous use of the two contested marks." *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1186 (6th Cir. 1988) (*Wynn I*). This fact-intensive analysis "impl[ies] no mathematical precision, and a plaintiff need not show that all, or even most, of the factors listed are present in any particular case to be successful." *Id.* The ultimate question remains "whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991). The strength of the mark, the similarity of the marks, and evidence of actual confusion are the "most important factors." *Kibler v. Hall*, 843 F.3d 1068, 1082–83 (6th Cir. 2016). And although bad intent in selecting the mark is "not necessary," it "may alone be sufficient to justify an inference that there is a likelihood of confusion." *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 455 (5th Cir. 2017); *Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*, 982 F.3d 280, 289 (5th Cir. 2020).

The parties have implicitly framed this case as a dispute about affiliation: whether words or marks "erroneously suggest[ ] a connection between the sources" through which the defendant may "seek[ ] to capitalize on the plaintiff's goodwill and established reputation." *Ameritech, Inc. v. Am. Info. Techs. Corp.*, 811 F.2d 960, 964–65 (6th Cir. 1987).[7]  Generally speaking, affiliation infringement concerns goods that do not compete with one another. *Id.* at 964.  But courts, including this one, have also applied the theory to competing goods. *See Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 703 F. Supp. 2d 671, 688 (W.D. Ky. 2010).  In the spirits industry, specifically, consumers may not realize that "companies produce multiple types of distilled spirits." *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 422 (6th Cir. 2012).  So consumer confusion about a product's source, sponsorship, or connection with a competing product may amount to infringement. *See Champions Golf Club v. The Champions Golf Club*, 78 F.3d 1111, 1118, 1121 (6th Cir. 1996); *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 388 (5th Cir. 1977).

Heaven Hill's case, like many plaintiffs', offers a mixed *Frisch's* bag.  Its J.W. Dant mark is not terribly strong or similar to Log Still's, yet Log Still used J.W. Dant's marks and goodwill repeatedly, expressly, and not necessarily in good faith.  Log Still did so to associate its new and growing spirits line with the attractive history of the J.W. Dant brand.  Unsurprisingly, this has already caused at least some actual confusion in the marketplace, even among journalists and others who follow the bourbon industry in some detail.  The current record leaves no choice but to find that Heaven Hill has proved a likelihood of confusion—and therefore success on the merits.

---

[7] The Lanham Act prohibits using words or marks in ways that are "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."  15 U.S.C. § 1125(a)(1)(A).  The Sixth Circuit has identified four overlapping types of infringement actions falling under this section:

1. "Palming off" (confusion about the source);

2. Affiliation or "confusion of sponsorship" (unrelated goods with similar marks that "erroneously sugges[t] a connection between the sources" in which the defendant may "seek[ ] to capitalize on the plaintiff's goodwill and established reputation");

3. Reverse confusion of sponsorship (newcomer floods the market to lead consumers to believe the mark was always its own); and

4. Dilution (non-competing product reduces a trademark's value over time).

*Ameritech*, 811 F.2d at 964–65.

## a. Strength of the plaintiff's mark

A mark's strength is determined by its "(1) 'conceptual strength,' or … inherent distinctiveness; and (2) 'commercial strength[,]' or 'the marketplace recognition value of the mark.'" *Progressive Distribution Servs., Inc. v. United Parcel Serv., Inc.*, 856 F.3d 416, 428 (6th Cir. 2017) (quoting *Maker's Mark*, 679 F.3d at 419); *see also Future Proof*, 982 F.3d at 290–91. In other words, a "mark is strong if it is highly distinctive, i.e., if the public readily accepts it as the hallmark of a particular source," whether "because it is unique, because it has been the subject of wide and intensive advertisement, or because of a combination of both." *Homeowners Group*, 931 F.2d at 1107. While a mark's distinctiveness sets a baseline for its strength, its commercial recognition can change that calculus. *Maker's Mark*, 679 F.3d at 419–21. So a conceptually strong arbitrary mark with no recognition can be weak, while a conceptually weak mark that is widely known can be strong.

As to "conceptual strength," Heaven Hill's marks are presumptively distinct (and thus also presumptively strong) because they are "incontestable," 15 U.S.C. § 1065, as discussed above at § III.A(1). *See Future Proof*, 982 F.3d at 293; *Maker's Mark*, 679 F.3d at 417; *Wynn I*, 839 F.2d at 1186–87.[8] This presumption may be rebutted by "presenting evidence of 'extensive third party use of similar marks.'" *Progressive Distrib.*, 856 F.3d at 429 (quoting *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 794 (6th Cir. 2004)). No such evidence exists here, though. For decades the only others using the name "Dant" in the marketplace were a cooperage in Lexington and two unrelated companies in China and Japan. Germain Report (DN 30-6) at 13, 21–22. This presumptive distinctiveness supports the marks' overall strength.

As to "commercial strength," however, the Heaven Hill marks fare worse. Commercial strength "depends on public recognition, or the extent to which people"— specifically, the relevant market—"associate the mark with the product it announces." *Progressive Distrib.*, 856 F.3d at 430; *see Homeowners Group*, 931 F.2d

---

[8] In the alternative, and regardless of incontestability, J.W. Dant could be considered distinctive because full names are registrable and thus distinctive, even without a showing of secondary meaning. The Lanham Act excludes from registration words, like Davis or perhaps Dant, that are "primarily merely a surname." 15 U.S.C. § 1052(e)(4); *see In re Etablissements Darty Et Fils*, 759 F.2d 15, 17 (Fed. Cir. 1985). So surnames, standing alone, must acquire "secondary meaning" (that is, consumer association with a commercial source, *DeGidio v. W. Grp. Corp.*, 355 F.3d 506, 513 (6th Cir. 2004)) to become registerable, *Marker Int'l v. DeBruler*, 844 F.2d 763, 764 (10th Cir. 1988). But the Act specifies "surnames," so the Patent and Trademark Office does not require a secondary meaning to register *full* names, like J.W. Dant. *See* 2 MCCARTHY § 13:2; TRADEMARK MANUAL OF EXAMINING PROCEDURE § 1211.01(b)(iii); *In re Yeley*, 85 U.S.P.Q.2d 1150, 1153 (T.T.A.B. 2007) (distinguishing the surname "Yeley" from the full name "J. J. Yeley," which was "registrable without secondary meaning"); *but see Tana v. Dantanna's*, 611 F.3d 767, 776 (11th Cir. 2010) ("The policy reasons for requiring secondary meaning for the use of a personal or surname as a mark extend equally to the use of full names.").

at 1107–08.  Commercial strength and secondary meaning turn on the same factors: (a) direct consumer testimony; (b) consumer surveys; (c) exclusivity, length, and manner of use; (d) amount and manner of advertising; (e) amount of sales and number of customers; (f) established place in the market; and (g) proof of intentional copying. *DeGidio v. W. Grp. Corp.*, 355 F.3d 506, 513 (6th Cir. 2004); *see* 2 MCCARTHY §§ 11:81–82; *CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263, 269 n.3 (4th Cir. 2006).  A survey is the "most persuasive evidence," while extensive advertising may also supply evidence of market recognition.  *Kibler*, 843 F.3d at 1074.  Neither is a prerequisite, although "plaintiffs lacking such proof must provide other evidence of broad public recognition."  *Id.* (quotation marks omitted).  *Compare Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 632 (6th Cir. 2002) (absence of mass advertising diminishes market recognition), *with Maker's Mark*, 679 F.3d at 419–21 (absence of survey evidence immaterial based on Maker's Mark's massive advertising and iconic seal).

The J.W. Dant brand is not commercially strong, rendering the strength of the marks relatively weak.  Although the marks have long been used in commerce without evidence of intentional copying (until now, at least), consumer surveys and advertising indicate a lack of widespread recognition among consumers.  Log Still's consumer survey (Heaven Hill didn't offer one) reveals that only 2.1% of bourbon consumers recognized the J.W. Dant logo mark.  DX 59 at 17–19.  This is far below other brands such as Jim Beam (92.1%), Wild Turkey (86.6%), Maker's Mark (82.1%), and other Heaven Hill brands like Evan Williams (59.2%) and Elijah Craig (25.3%). *Id.*  In fact, J.W. Dant was one of the least recognized brands among those Log Still's expert tested.  *Id.*  A survey is not foolproof, of course; this one tested only individual marks outside their usual commercial context.  *Id.* at 3.  Viewing the mark on a bottle, as a consumer likely would, could provide more probative evidence of recognition. And an important part of the mark's goodwill is its history and story, which is not easily measured.  Even so, the survey results represent fairly strong evidence that the brand is not commercially strong.

The marketing for J.W. Dant is even more telling.  It does not appear on Heaven Hill's list of 19 bourbons on its website.  DX 29.  Everyone agrees that Heaven Hill spends little to advertise J.W. Dant, less than $12,000 *total* over 16 years for all the related J.W. Dant brands.  PX 5; Shapira, Tr. I at 156–62; LS Opp. Br. at 23.  This is a fraction of the millions Heaven Hill spends on marketing.  *Id.*  And even $100,000 a year, the Sixth Circuit has held in a different context, may not be significant enough to stand out.  *Burke–Parsons–Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 595 (6th Cir. 1989).  To be sure, Heaven Hill points to examples of earned media in which journalistic and other outlets discussed the brand in a non-advertising context.  PX 6; Lubbers, Tr. I at 196–201.  But Heaven Hill offers no evidence about how widespread or valuable such exposure is, and on its face it appears marginal— certainly compared to the attention given Heaven Hill's Evan Williams and Elijah Craig brands.  Suffice it to say this earned media is unlikely to fully compensate for Heaven Hill's lack of paid advertising to promote the J.W. Dant brand.

The same point applies to the tastings, brand ambassadors, and bottled-in-bond program Heaven Hill uses to promote the Dant brand. Shapira, Tr. I at 78–82. J.W. Dant appears some in these mediums, but not in a widespread or regular way. Shapira, Tr. I at 78–82, 150–53, 163; Lubbers, Tr. I at 192–93, 236. Similarly, J.W. Dant makes an appearance on the Heaven Hill distillery tour, Shapira, Tr. I at 77, but only in one spot in a small corner of the massive campus, PX 4 at 2. It receives somewhat more prominent placement, along with other bottled-in-bond products, at the new visitor's center that opened in June 2021. PX 4 at 4. But the impact is at best unclear, and highly unlikely to have a quick and earth-shattering effect on J.W. Dant's market recognition.

Who cares, responds Heaven Hill, our brand is so strong it sells itself to thousands of loyal customers who "pull" the bottles off the shelf even without any traditional advertising. *See* above at § II.A(2). What could be a stronger showing of commercial strength? This theory, however, would only work if J.W. Dant's sales were high and consistent—indicating that a large swath of consumers already recognize the brand. Nothing indicates they do. In 2004 Heaven Hill sold more than 47,000 cases (at 12 bottles per case) of J.W. Dant spirits, including more than 12,000 cases of bourbon. PX 5. This has declined markedly, to some 21,000 cases sold in 2020, including only 3,000 cases of bourbon. *Id.* Guiness, by contrast, sold 25,000 cases of J.W. Dant bourbon before its transaction with Heaven Hill. DN 39-3 at 51 (average sales, 1989–91). Gross revenue for all J.W. Dant brands has dropped from $2.6 million in 2004 to $1.2 million in 2020. PX 5. Net revenue remains high on a percentage basis, though the total has decreased with Dant's falling sales: approximately $1 million in 2004 compared to $600,000 in 2020. *Id.* By comparison, the Sixth Circuit has held that $2 million in annual gross sales may not be significant. *Burke–Parsons–Bowlby Corp.*, 871 F.2d at 596. Dant sales—already comprising less than 1% of total Heaven Hill sales—have fallen while the company's other bottled-in-bond brands grew significantly. Shapira, Tr. I at 156–57. To put this into perspective, Jim Beam sells 10.7 million cases a year, Evan Williams 3 million, and Woodford Reserve 1 million.[9] So 21,000 cases and falling is hardly the type of large and consistent consumer base that would reflect a strong market presence and negate the need to show a mark's strength through advertising. *See Kibler*, 843 F.3d at 1074 (sale of 60,000 albums across 16 years shows weak recognition).

This focus on national brands is also misguided, Heaven Hill argues; any craft distillery would love to reach those numbers. This misses the point. Heaven Hill is not being punished for selling its other bourbons with more success. These numbers just serve as benchmarks for a successful and well-recognized bourbon brand in the national market. Given J.W. Dant's almost nonexistent advertising efforts and relatively weak sales, at least compared to the national brands Log Still wishes to

---

[9] *See* Travis Gillmore, *The Best Selling American Whiskey Brands in the World for 2021*, VINE PAIR, July 6, 2021, https://vinepair.com/booze-news/best-selling-american-whiskey-brands-2021/.

compete with, LS Opp. Br. at 36, it is hard to say that J.W. Dant has a well-recognized place in the market—or a commercially strong mark. *Kibler*, 843 F.3d at 1074.

### b.  Relatedness of the goods

Relatedness is often assessed according to three categories of functional similarity and consumer competition:

1. "if the parties compete directly by offering their goods or services, confusion is likely if the marks are sufficiently similar;"

2. "if the goods or services are somewhat related but not competitive, the likelihood of confusion will turn on other factors;" and

3. "if the goods or services are totally unrelated, confusion is unlikely."

*Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 282–83 (6th Cir. 1997); *see also Champions Golf Club*, 78 F.3d at 1118.  Services and goods "are 'related' not because they coexist in the same broad industry," but because they "are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company." *Homeowners Group*, 931 F.2d at 1109. For example, the Sixth Circuit deemed bulk car-wash wax "related" to DIY car-cleaning products because the two companies at issue sold fundamentally the same thing—a clean car. *Wynn I*, 839 F.2d at 1187.  Likewise, some relatedness existed between a used music store and a new retailer because both sold electronic music equipment that consumers could use in a fungible manner. *Daddy's*, 109 F.3d at 282–83.

But "[j]ust because there is some overlap between the two services, it does not follow that the companies compete directly for the same base of customers." *Progressive Distrib.*, 856 F.3d at 432 (although both companies were involved in logistics, one served business outsourcing needs at a substantial price, while the other offered free service to smaller customers); *see also Therma-Scan*, 295 F.3d at 633 (medical technologies distributed indirectly through healthcare professionals did *not* compete with those sold directly to the public, based on differences in use and marketing).  The type of consumers, their use of the good or service, and their location can all affect whether parties are in direct competition. *See Champions Golf Club*, 78 F.3d at 1118 (even though golf clubs offered identical services, whether they were competitive depended on their locations (in different states) and customer bases (which differed)).

So does Log Still compete with the J.W. Dant brand?  Log Still's marketing firm asked that very question: "competitors – who are they?"  PX 24 at 7.  Among its answers was the "J.W. Dant brand," which it feared could lead to "possible confusion." *Id.*  Log Still worried it "may have to deal with" that issue while "Heaven Hill may see some pickup from that confusion." *Id.*  Responding to favorable media regarding

the J.W. Dant brand, Wally Dant said he didn't want Heaven Hill's demand to increase and noted that he "[w]ish[ed] they'd be more quiet about it." PX 29 at 1; *see also* PX 31 at 1. So even Log Still's leaders recognize a potential connection between demand for its products and J.W. Dant's. This overlap is unsurprising. Heaven Hill and Log Still produce goods that serve the same basic function for similar consumers: providing a hard liquor for personal consumption, as well as bourbon tourism for consumers seeking a more experiential and historical experience. This direct competition and similar functionality are accentuated, of course, since both parties produce and spotlight bourbon. And both sell bourbon to consumers in liquor stores that overlap geographically. PX 24 at 6–7; PX 48 at 21; Dant, Tr. I at 279.

Log Still resists being lumped in with the bottom-shelf J.W. Dant label. Because retailers sell its spirits at a higher price point, why should the two brands be considered in direct competition? In *Maker's Mark v. Diageo*, after all, the Sixth Circuit accepted the district court's conclusion that Maker's Mark bourbon and Cuervo tequila were merely "somewhat related" because they shared the spirits category only in a very broad sense, and were separated by a wide price difference: Cuervo cost $100 while Maker's Mark cost $24. 679 F.3d at 423. Here the products are more related, however. Although the labels sell other liquors as well, these proceedings have focused overwhelmingly on bourbon, the most important spirit geographically and economically for both brands. The price differential between Log Still and J.W. Dant bottles ($80 vs. $15 to $18), is not tight, but is smaller (in absolute terms, at least) than in the Maker's Mark case. PX 6 at 11, 36; Dant, Tr. II at 128. Log Still concedes that its future whiskeys and bourbons may sell for less—as low as $30—which would naturally render the brands more competitive with one another. *Id.*; Shapira, Tr. I at 124–25; Lubbers, Tr. I at 223–26. Indeed, some of Log Still's gin already sells for close to $30. Dant, Tr. II at 128; PX 24 at 5–6; PX 48 at 12–13. So the J.W. Dant brand competes against many different spirits in different ways. Shapira, Tr. I at 124–25. And although price differences can distinguish some products and their consumers, in this context the price points are not so far apart that they overcome other evidence and logic that these two Kentucky bourbon distillers offer related and competing products.

This proximity is also quite relevant to competition in the burgeoning bourbon-tourism market. Both companies welcome visitors for tastings and tours to campuses only a few miles apart. *Id.* at 80–81. The offerings at Dant Crossing, Log Still contends, differ categorically because they include weddings, lodgings, concerts, trails, and more. Heaven Hill offers none of this. But as Heaven Hill notes, varying amenities reflect the competition between distilleries to make their tours distinct and their locations desirable. Many companies—including these two—have focused on their welcome centers to drive revenue not just from tours and gift shops, but also from brand awareness leading to bottle sales. *Id.* at 72–74.

That Log Still's own marketing experts consider J.W. Dant a direct competitor would likely suffice. That's corroborated, however, by Heaven Hill's evidence that

both parties sell spirits, particularly bourbon, to the same consumer base in similar ways at similar locations. True, Log Still is conducting business under the Dant Crossing, Monk's Road, and Log Still names, and has no plans to offer a Dant-branded liquor. And although J.W. Dant appears in Heaven Hill's visitor center, PX 4 at 2, its tours don't emphasize him, LS Opp. Br. at 36–37. Regardless, Log Still's counterarguments don't undermine the reality of the brands' competition; they just beg the ultimate question in this case—whether Log Still's *use* of J.W. Dant in offering its related products is likely to confuse consumers despite the products' differing names. *See, e.g.*, *Champions Golf*, 78 F.3d at 1121. So the relatedness factor heavily favors Heaven Hill.

### c. Similarity of the marks

Similarity turns on how a regular consumer would actually come across the marks in the marketplace, whether the consumer could tell the marks apart, and whether the consumer would think different products were affiliated. *Future Proof*, 982 F.3d at 295. The analysis encompasses an "anti-dissection rule" that requires courts "not to dwell on the prominent features of a mark," but "instead consider it as a whole." *Kibler*, 843 F.3d at 1077; *see also Homeowners Group*, 931 F.2d at 1109 (evaluating the "overall impression" of the marks in context, "not an individual feature"); *Little Caesar Enterprises, Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 571 (6th Cir. 1987) (mark "should not be split up into its component parts and each part then compared with parts of the conflicting mark to determine the likelihood of confusion"). Will the mark "'be confusing to the public when singly presented'" "in the light of what occurs in the marketplace"? *Homeowners Group*, 931 F.2d at 1109. The answer depends on how the marks look and what they say, *Kibler*, 843 F.3d at 1076–79, on their "labels, packages, or ... advertising material directed to the goods," *Future Proof*, 982 F.3d at 295.

Similarity can also account for the relationship between a "house mark" and a "junior mark." A house mark is a "product labe[l]" that identifies the manufacturer, *Maker's Mark*, 679 F.3d at 422, while a junior user's mark is a newer mark that may infringe on an existing trademark, *id.* at 419, 422; *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 633 F.3d 1158, 1164 (9th Cir. 2011) (quotation omitted). Their pairing does not necessarily "eliminate the similarity between [two] trademarks" that otherwise resemble one another. *Therma–Scan, Inc.*, 295 F.3d at 634. "Instead, this labeling diminishes the likelihood of confusion created by the comparable marks and reduces the importance of this factor." *Id.*; *see also AutoZone*, 373 F.3d at 797 ("The co-appearance of a junior mark and a house mark is not dispositive of dissimilarity, but it is persuasive."). The use of a differentiating house mark may not help a defendant in an affiliation case, however. "[W]hen the two products are related enough ... one might associate with or sponsor the other and still use their own house mark," leading consumers to infer that brands are connected despite or even because of the presence of a house mark, given that some "companies produce multiple types

35

of distilled spirits." *Maker's Mark*, 679 F.3d at 422 (quoting district court and finding some similarity despite the presence of a house mark).

Heaven Hill points to four examples of Log Still using J.W. Dant marks or their associated goodwill in a manner similar to Heaven Hill's use.

**1. "The Dant Distillery Company."**   In the "Tasting Room at Dant Crossing," Log Still displays several bourbon barrels stenciled to read "The Dant Distillery Company." PX 41 at 1–3. The Dant Distillery mark is a common-law mark owned by Heaven Hill that appears on every bottle of J.W. Dant. PX 52 at 29 (bottle 1). Log Still may not freely use that same language as its own.

Log Still argues that the presence of some of its "house marks" would reduce any confusion. *See Therma–Scan, Inc.*, 295 F.3d at 634. Each barrel's "bung," or stopper, is stamped with one of Log Still's marks—the 18-D-36 crest. PX 41 at 5. And consumers might not readily see the Dant Distillery stenciling, given that the barrels are surrounded by other Log Still house marks in the tasting room. Dant, Tr. II at 124. Yet the close and related combination of Dant Distillery and Log Still marks could easily create the misimpression of affiliation that the Lanham Act protects against: seeing Heaven Hill's Dant marks and Log Still's house logo together on their core products—barrels of bourbon in a distillery tasting room. This could certainly lead a consumer to believe that J.W. Dant is affiliated with Log Still or vice versa. *See Maker's Mark*, 679 F.3d at 421–22.



**Dant-Stamped barrel in the Tasting Room at Dant Crossing (PX 41 at 3)**

**2. Internet and social media.**  The marketing campaign discussed above (at § II.B) also features several J.W. Dant marks or bottles. *See, e.g.,* PX 34 at 7, 11; PX 13 at 4–6, 7–12; Germain Supplemental Report at 2–4. These pictures include captions such as "A Family Legacy" or "A Legacy Worth Reviving," naturally and intentionally leading consumers to believe that J.W. Dant and Log Still are affiliated. PX 34 at 7, 11. Log Still also purchased and exploited the jwdant.com domain name,

a direct copying of the J.W. Dant name that would lead people to believe the two were directly associated. PX 18 at 1–2; PX 30 at 2; *see Audi AG v. D'Amato*, 469 F.3d 534, 543–45 (6th Cir. 2006) (similarity of www.audisport.com and Audi's own domain name). As with the Dant Distillery barrels, the commingling of Log Still's house marks alongside the J.W. Dant marks only heightens the risk of mistaken affiliation. *See Maker's Mark*, 679 F.3d at 421–22.

**3. Logos.** Heaven Hill contends the Log Still and J.W. Dant marks used on their respective bottles are similar enough to cause confusion. The Court is unconvinced that the designs alone (as opposed to their use in marketing intended to "subtly t[ie]" the brands, PX 25 at 3) would cause consumers to affiliate the brands, *Kibler*, 843 F.3d at 1076–79. Yes, Log Still used Dant marks to inspire its own design concepts—not a great look for an alleged infringer. *See* PX 22 at 1–2. But those drawing-board drafts are more important in assessing Log Still's intent (covered below) than the similarity of its marks as consumers actually see them. *See, e.g.*, *Future Proof*, 982 F.3d at 296.

Some of these marks do share certain elements—such as a similar cursive script on the primary label:

 

**Log Still and J.W. Dant Script Logos**

These marks are the most similar: similar color, similar three-dimensional font, similar cursive, and similar tails trailing the G, L, and T letters. But they differ meaningfully: the Dant logo is tilted with "genuine sour mash" written in black and white inside a curve off the T, while Log Still is followed only by the word "DISTILLERY" in gold block letters. And Log Still and J.W. Dant do not sound or look alike. Absent other suggestive context, a consumer would be unlikely to conclude that the two products were affiliated after confronting these logos—even if positioned side-by-side (which is unlikely in the marketplace).

37



**Log Still 18-D-36 crest and J.W. Dant kernel logo**

Viewing the circular logos alongside one another leads to the same conclusion. The 18-D-36 crest and J.W. Dant corn-kernel logos contain no similar words, text, font, or allusions. They are both circular and both contain black, white, and gold—though in an aesthetically dissimilar way. One incorporates a ribbon wrapped around the end of a log, while the other features kernels positioned . Same story for the year 1836 and the letter D: including these harms Log Still's case, but not because consumers would find these two logos confusingly similar. Otherwise, the ribbon-wrapped log looks nothing like the arranged kernels.



The "Dant Crossing" logo shares only the word Dant with the Heaven Hill logos. Even though the word Dant may be the most prominent feature, the law doesn't view it in isolation. *See Kibler*, 843 F.3d at 1076–79. The font and colors differ completely from any Heaven Hill logo, as do the words Crossing and the Gethsemane, Kentucky location. Viewed in their entirety, a consumer is not likely to find any of Log Still's logos to be similar to the J.W. Dant logos.

**4. Bottles.** While some consumers may come across the isolated logos online or while touring a distillery, the most common place a consumer would confront the marks is on the companies' bottles—sitting among numerous others—on retail shelves. *See Homeowners Group*, 931 F.2d at 1109. The likelihood of confusion here is relatively small. Log Still's bottles are stout and cubic, feature a label with a stylized shape, and contain prominent house marks. J.W. Dant bottles are dissimilar: tall, cylindrical, shaped like a Bordeaux wine bottle, and labeled in a standard rectangular shape. They also contain quite different house marks, including the Dant Distillery Company common-law mark discussed above. The text on the labels is

totally different.  J.W. Dant's house mark features prominently, while Log Still's bourbon uses a medieval font for Monk's Road and at least five other fonts on the front label alone.  The bottles appear to have only one font in common—the script for Cold Spring Distillery (LS) and The Dant Distillery Company (HH).  But these are short, tertiary phrases at the bottom of otherwise divergent bottles.  And Log Still's 18-D-36 mark is positioned on a blue background around the neck, whereas J.W. Dant uses a white bottled-in-bond neck label.

House marks—like the 18-D-36 crest on Monk's Road—can suggest brands are affiliated when paired with directly copied or similar junior marks, such as the ones seen in the social-media posts above.  *See Maker's Mark*, 679 F.3d at 421–22.  But when the marks and context differ—as the bottles do—the house mark only heightens the difference, rather than suggesting any sort of affiliation.  *See Progressive Distrib.*, 856 F.3d at 433 (marks lacked similarity, despite an identical main word, because they used different colors, fonts, designs, and house marks).



**Monk's Road and J.W. Dant bourbons (DX 41 and PX bottle 1)**

Compared to their bourbon cousin discussed above, the gin bottles and their pastoral transparent designs use fewer of the J.W. Dant marks, in a manner far less likely to cause confusion, in connection with a substantially different spirit.



**Monk's Road gin (PX 16; DXs 41–42)**

A final similarity worth noting: all Log Still bottles discuss J.W. Dant's story on their front or back. They include the 1836 date, which also appears three times on the J.W. Dant bottle, including as part of the logo. And all contain a representation of Wally Dant's signature that, according to Heaven Hill, resembles a gold J.W. Dant. The story and date are objectionable for the reasons described above, *see* § III.A(2)(d), and could very well lead a reader to confuse the Monk's Road and J.W. Dant products as affiliated. Inducing that association appears to be the only point of discussing J.W. Dant on a bottle of Not-J.W.-Dant liquor. But as a matter of visual similarity, the story and date do little to render neighboring marks confusing. The same applies to the Dant signature. True, it reads J.W. Dant. Truer still, Wally Dant's explanation conflating the Z-shape and the roman numeral III is hard to credit. Dant, Tr. II at 45–46. But that is unlikely to matter much in context. Below the signature is a line that distinguishes Wally from the original J.W.: it reads "J.W. (Wally) Dant III, President/Distiller." That eliminates any confusion about whose signature appears on the bottle. Only if Heaven Hill points to evidence that this is not, in fact, Wally Dant's real signature that he claims to have used throughout his adult life would this amount to a case of stolen identity, as opposed to sloppy handwriting.



\* \* \*

In light of all these marks, considered in their consumer context, the record reveals some instances of clear infringement that could heighten the risk of affiliation. The logos and the bottles that consumers would most commonly encounter, however, are dissimilar. The real thrust of this case, in any event, is the

40

affiliation between the history of the J.W. Dant brand and Log Still.  On that score, Log Still's use of the story of Wally Dant's ancestor is quite probative of similarity. As a result, this important factor points both ways, depending on the marks in question.

### d. Evidence of actual confusion

"Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion." *Daddy's*, 109 F.3d at 284 (quotation omitted).  Because it's often hard to find, this factor "is weighted heavily only when there is evidence of past confusion, or perhaps, when the particular circumstances indicate such evidence should have been available." *Id.* (quotation omitted).  When evidence of confusion would be unexpected due to a small market or a recent act of infringement, a single instance of actual confusion can serve as strong evidence of potential future confusion.  *See id.*; *Little Caesar*, 834 F.2d at 571–72 (recency explains lack of evidence of actual confusion); *Maker's Mark*, 679 F.3d at 422 ("it is reasonable that no meaningful evidence of actual confusion was available" because "the Reserva product was sold for a short time and in limited quantities").  On the other hand, merely "isolated instances of actual confusion after a significant period of time of concurrent sales or extensive advertising" would not necessarily increase the likelihood of confusion, and could even suggest confusion is unlikely.  *Daddy's*, 109 F.3d at 284; *see also Progressive Distrib.*, 856 F.3d at 434 (limited evidence of confusion despite mass advertising indicates actual confusion is presumptively unlikely); *Kibler*, 843 F.3d at 1078–79 (10 instances of confusion favor plaintiff only slightly, given massive sales and online interactions).

Here we have the "best evidence"—examples of actual confusion in social and traditional media alike.  Log Still has existed only since 2018, and has sold its products only since 2021.  Dant Tr. I at 260:3–7, Tr. II at 40.  Yet numerous consumer and media reactions indicate a misperception that Log Still is either affiliated with or reviving the original J.W. Dant brand.

- In response to a Log Still picture that reads "The Dant Family is Back," commentors asked:

  o "is that J W Dant I used to drink"?

  o "What about JW Dant is that coming back?"  PX 20 at 3.

- WHAS-11 TV interviewed Wally (whom they introduced as "J.W.") Dant about the story of Log Still as one of "heritage and revival" of his family's

"legacy," while showing pictures of a bottle of *Heaven Hill's* J.W. Dant product and barrels labeled Dant Distillery.  PX 11 at 1.[10]

> o The story didn't mention Heaven Hill and only briefly noted that the Dants sold the family business in the 1940s.

> o Instead, Wally referred to Log Still's recipes as an homage to J.W. Dant's recipe, while pictures of J.W. Dant and his branded bourbon appeared on screen.  *Id.*



**WHAS-11 TV pictures of J.W. Dant and his trademarks
during Wally Dant interview**

- The Distillery Trail Blog, an industry-focused website, ran a story on the new distillery carrying the headline "Log Still (formerly J.W. Dant)."  PX 15 at 1.[11]

---

[10] The video remains available online.  WHAS-11, *Great Day Live: Log Still Distillery on Great Day Live!*, YOUTUBE (Oct. 16, 2020), https://www.youtube.com/watch?v=nObsqOeAygs (posted on Oct 16, 2020).

[11] This article from the Distillery Trail blog is no longer available online.  But the headline remains probative of industry confusion at the time and in the future.  PX 15 at 1; Tr. I at 111–13 (acknowledging the saved blog post is authentic and probative, albeit incomplete).  Some of the consuming public, of course, may have read this and become confused before the blog removed it.  The same goes for the Google searches: the context may reduce the value of

- Google searches for "J.W. Dant" and its variants ("J.W. Dant bourbon distillery," "where is JW Dant distillery?", etc.) regularly return results for Log Still Distillery.  PX 21 at 1; Lubbers, Tr. I at 203–8 (corroborated by the Court's own searches during the hearing).

- A Log Still tourist posted online photos of the distillery (including a picture of the J.W. Dant storyboard) after "[s]pen[ding] the afternoon at Log Still Distillery!", which he described as "[t]he original J.W. Dant distillery!"  PX 20 at 1:



Log Still raises two arguments in hopes of undermining this showing, but neither rebuts the evidence that at least *some* consumers, and undoubtedly others who visited Dant Crossing or viewed traditional and social media, *have already* been confused by Log Still's apparent affiliation with J.W. Dant.

*First*, in the short time Log Still has offered its product, the record reveals no single customer who purchased one brand under the misimpression that it was affiliated with or owned by the other.  LS Opp. Br. at 41–42; Shapira, Tr. I at 180–82; Lubbers, Tr. I at 253.  Such purchasing confusion would amount to "serious confusion of actual customers," entitled to greater weight than confused inquiries or searches.  *See Kibler*, 843 F.3d at 1078–79.

But Log Still has only had actual customers for a couple months.  And consumers of Log Still's tourist offerings *have* already expressed confusion that this distillery produces J.W. Dant bourbon.  These online posts, while perhaps not as important as bottle purchases, represent Log Still's primary advertising channel.  PX 48 at 22 ($467,200 in social-media expenditures).  That the posts created such early

---

this evidence somewhat, but it still usefully reflects the way many contemporary consumers would interact with either brand.

confusion represents meaningful evidence of actual confusion. *See Maker's Mark*, 679 F.3d at 422. Moreover, evidence of actual confusion does not have to come from a consumer; it can come from a producer, retailer, or the general public. *See Champions Golf Club*, 78 F.3d at 1119–20 (accounting for manufacturer and vendor confusion). So the fact that media—especially bourbon-focused media—has exhibited confusion indicates that at least some consumers will be confused as well. *See, e.g.,* PX 11 at 1. Especially since the media will often have more resources and expertise regarding the topics they cover than an average consumer would. This is not just "confusion of individuals casually acquainted with a business," and therefore "worthy of little weight." *Homeowners Group*, 931 F.2d at 1110 (quotation omitted). If even the reporters are confused, some portion of their audience likely would be too.

Ironically, Log Still's own marketing team supplies further corroboration. It identified Heaven Hill's J.W. Dant label as a competitor of Log Still's Monk's Road label and raised worries about purchaser confusion well before this litigation: "we may have to deal with possible confusion there. Heaven Hill may see some pickup from that confusion." PX 24 at 7. Through emails and marketing strategies, Log Still has expressed worry that media coverage of J.W. Dant and its own activities could increase demand for J.W. Dant, a natural consequence of confusion regarding the products' origin and affiliation. *See* PX 24 at 7; PX 29 at 1,4; PX 31 at 1; PX 32 at 1; *Champions Golf Club*, 78 F.3d at 1119.

*Second*, Log Still notes that its expert showed consumers an array of bourbon bottles and found that only 5% of study respondents expressed confusion regarding the Dant and Monk's Road bottles. Nowlis Expert Report (DX 58) ¶ 64. Such a low level is generally considered evidence that "confusion is not likely." 6 MCCARTHY § 32:189 (reviewing cases).[12] But that merely confirms what the evidence above revealed about the limited similarity of the bottles themselves.[13] At the end of the day, this is not a case about bottle comparisons; it's a dispute about who controls the J.W. Dant tale in the spirits market. On that salient point, Heaven Hill has presented strong early evidence of actual confusion.

---

[12] *See, e.g., James Burrough, Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266 (7th Cir. 1976) ("We cannot agree that 15% is 'small'" given other evidence.); *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 365 F. Supp. 707, 716 (S.D.N.Y. 1973) (7.7% lowest accepted); *Henri's Food Products v. Kraft, Inc.*, 717 F.2d 352, 358 (7th Cir. 1983) (7.6% too low and shows confusion unlikely).

[13] Heaven Hill's rebuttal expert Hal Poret offered a report poking holes in the Nowlis study regarding the way in which respondents viewed the bottles. DN 45-35. But any impact of the expert's design choices is likely immaterial, and certainly overshadowed by the limited salience of the bottle-to-bottle comparison.

### e. Marketing channels used

This factor turns on "how and to whom the respective goods or services of the parties are sold." *Progressive Distrib.*, 856 F.3d at 434 (quotation omitted). If the goods are sold and advertised through different avenues, confusion is less likely. *Id.*; *see also Homeowners Group*, 931 F.2d at 1110 (differing retail and commercial channels may cause "little likelihood of confusion" (quotation omitted)); *Little Caesar*, 834 F.2d at 572 (sophisticated televised advertising campaign by national fast-food chain was "quite different" from less sophisticated advertising by local fast-food business).

With respect to online marketing specifically, courts ask whether "the parties use the internet as a substantial marketing channel." *Kibler*, 843 F.3d at 1079. Log Still certainly does, and Heaven Hill likewise points to earned media that often appears in online outlets. PX 6 (J.W. Dant earned media), 14, 15; Earnhart, Tr. II at 175–76 (describing similar sources of Log Still marketing). This "simultaneous use of the Internet as a marketing tool exacerbates the likelihood of confusion," given that "entering a web site takes little effort." *Audi AG*, 469 F.3d at 5444 (quotation omitted). Social media ads are Log Still's primary advertising channel thus far. *See* PX 48 at 22 (totaling expenditures). Next, do the parties use their "marks … with web-based products"? *Kibler*, 843 F.3d at 1079. Only indirectly, as spirits generally are not purchased online (though tours are), and indirect marketing certainly takes place online, as Log Still's abundant social media exemplifies. PX 48 at 22. Finally, "do the parties' marketing channels overlap in any other way?" *Id.* Definitely. Alcohol regulations require distillers to sell into the "three-tier system," in which wholesale distributors sell distillers' products to retailers, routing most spirits into the same general channels. *See Lebamoff Enters. Inc. v. Whitmer*, 956 F.3d 863, 868 (6th Cir. 2020). And the products would often appear near one another in the bourbon section of liquor stores. PX 24 at 6; Dant, Tr. I at 279. This overlap also extends to earned media apart from the internet as well. *See generally* PXs 6, 14, 15; Earnhart, Tr. II at 175–76.

Moreover, both parties target the same consumers for bourbon tourism. The Kentucky Bourbon Trail, a major tourism driver, already features Heaven Hill as a stop. Now its sister route—the Kentucky Bourbon Trail Craft Tour—will feature Log Still Distillery. Shapira, Tr. I at 75 (recent approval of Log Still); Dant, Tr. II at 77–78; PX 53 at 1. The distilleries are within 10 or 12 miles of each other. Shapira, Tr. I at 80–81. Both have public road signs directing travelers in the area. PX 38 at 1. To be sure, a similar physical presence, like a similar online presence, does not necessarily *guarantee* consumer confusion. But the evidence of similarity seen here certainly raises the risk, particularly when accompanied by context and marketing suggesting a false connection between these products.

On balance, this factor favors Heaven Hill.  Both distilleries use similar marketing channels to target basically the same set of consumers, though Heaven Hill's limited advertising of J.W. Dant reduces the weight this factor carries.

### f.  Likely degree of purchaser care

This factor considers whether the "typical buyer exercising ordinary caution," *Homeowners Group*, 931 F.2d at 1111, "would differentiate between products with similar trademarks," *Therma-Scan*, 295 F.3d at 638.  If that product's typical buyer would have expertise or greater sophistication, or if the product is "expensive or unusual," then "a higher standard is proper." *Homeowners Group*, 931 F.2d at 1111.  But while "selling one's property," for example, "is likely the most significant commercial transaction ever undertaken for most people," *id.*, the public is less likely to carefully research, say, pizza purchases, *see Little Caesar*, 834 F.2d at 571–72. And if "the marks are not very similar," moreover, "then even a high degree of purchaser care will decrease only slightly the already low likelihood of confusion." *Id.*  But the factor may still matter, despite differing marks, if a consumer thinks the products are "somehow affiliated." *Therma-Scan*, 295 F.3d at 638.

This factor is basically a wash.  Bourbon buyers span the sophistication spectrum.  *See* Shapira, Tr. I at 125–26; Lubbers, Tr. I at 215–16.  While "knowledgeable bourbon customers" purchasing expensive spirits would likely exercise great care, *Maker's Mark*, 679 F.3d at 423, "the average American who drinks … on occasion can hardly pass for a connoisseur" and "remains an easy mark for an infringer," *Taylor Wine*, 569 F.2d at 733–34.  Although the price difference between Monk's Road's most expensive offerings and J.W. Dant is significant, the gap is narrower than the $76 difference in *Maker's Mark*, 679 F.3d at 423, where the Sixth Circuit nevertheless recognized some degree of confusion between products offered at divergent price points.

In any event, this is a case about affiliation, not palming off.  The initial examples of customer and media confusion suggest that even sophisticated consumers could be confused regarding who makes which bourbon.  *See Therma-Scan*, 295 F.3d at 638 (even sophisticated consumers exercising a high degree of care could be confused due to brands' potential affiliation and marks' similarity); *Champions Golf*, 78 F.3d at 1121 (products' association may negate consumer sophistication).  Although the bottles differ, Log Still's draws on the legacy of J.W. Dant and the year of his log-still innovation to signal to curious customers that they are buying a taste of bourbon history.  Likewise, someone visiting Log Still's website or taking a tour would likely confront at least some of the information discussed above suggesting the brands are affiliated—heightening rather than dispelling this misconception.

46

### g. Defendant's intent in selecting the mark

"If a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity." *Homeowners Group*, 931 F.2d at 1111. "[P]urposeful copying indicates that the alleged infringer, who has at least as much knowledge as the trier of fact regarding the likelihood of confusion, believes that his copying may divert some business from the senior user." *Daddy's*, 109 F.3d at 286.

"Direct evidence of intentional copying is not necessary to prove intent," *id.* at 286, while circumstantial evidence can arise from the "use of a contested mark with knowledge of the protected mark at issue." *Id.* But prior knowledge is probative, rather than dispositive, because a user can in good faith believe it is not infringing. *Progressive Distrib.*, 856 F.3d at 436 ("[K]nowledge of a trademark, alone, will not support a finding of intent to confuse if other circumstances show that the defendant believed there was no infringement.").

Log Still knew Heaven Hill owned the J.W. Dant brand. That's why Wally Dant tried to buy it at the outset. Shapira, Tr. I at 98–101; Dant, Tr. I at 265, 280, Tr. II at 115, 120; PX 7 at 1. Even when Log Still realized it was unlikely to get the brand, it still wanted a name "related to the history of the family" and chose "Log Still" to fulfill that goal. PX 24 at 2. It did so despite awareness that some of its actions could raise legal concerns on the part of Heaven Hill. *Id.* at 7; PX 26 at 1–2. Wally Dant told a journalist that he hoped Heaven Hill would sell the brand because "we could do better with it." PX 35 at 2. He was proud of J.W. Dant and wanted to revive the "Dant legacy." PX 37 at 2. In fact, one of the main "threats" the marketing team identified was "Legal challenges-J.W. Dant brand/Heaven Hill." PX 24 at 9. Log Still was correct, as Heaven Hill sent three cease-and-desist letters regarding potentially infringing actions. PX 8 at 12, 13. In addition, Heaven Hill challenged Log Still's attempts to trademark "Dant & Head" before the Trademark Trial and Appeal Board. PX 9 at 4–9. This caused Log Still to abandon the petition and the Board to enter judgment against Log Still, refuse the registration, and sustain Heaven Hill's opposition. *Id.* at 41. So at the very least, Log Still knew about the J.W. Dant trademarks and the potential that its business plan could raise trademark concerns.

What happened next, in Log Still's view, shows its good-faith efforts to follow the law and respect the Dant marks: it complied with the cease-and-desist letters and retracted the trademark application. The critical question under trademark law is not whether the junior user tried to limit legal liability, however, but whether it chose its marks and marketing with the intent to cause confusion and exploit the senior owner's goodwill. *See Homeowners Group*, 931 F.2d at 1111.

Once again, the answer provided by Log Still's marketing experts is telling:

47

> We feel the native Dant Family brand story of the log still creates a perfectly positioned name *for building brand equity in the family history & subtly tying the new distillery to the J.W. Dant name. This name creates direct ties to the J.W. Dant name whether the brand can be used or not* and it creates an opportunity of strong brand imagery for the master brand.

Master Brand Name Recommendation (PX 25 at 3) (emphasis added).

This is descriptively accurate and legally damning. The "native Dant Family brand story" refers to the preexisting J.W. Dant brand and its associated goodwill—both owned by Heaven Hill. The "brand equity" Log Still set out to build rested on Joseph Washington Dant's family history far more than on that of Wally Dant and his cousins—even if some overlap exists. By referring repeatedly to the "J.W. Dant name" and story, Log Still is "creat[ing] direct ties to" a mark owned by Heaven Hill. Deciding to proceed with this plan "whether the brand can be used or not" indicates that Log Still knew its trademark risk, but decided to proceed with this "Master Brand Name Recommendation" regardless, executing the plan proposed by the marketers even though it lacked a license or permission from Heaven Hill. *See* § II.B, III.A(2)(d) above. Direct evidence of intent, as trial judges regularly instruct juries, is hard to come by. *See generally* Sixth Circuit Pattern Jury Instruction § 2.08 (2) Inferring Required Mental State ("Ordinarily, there is no way that a defendant's state of mind can be proved directly" so it "can be proved indirectly" by circumstantial evidence). Yet the Log Still marketing plan is about as close as many lawyers will ever come to a smoking gun.

But wait, there's more! During the branding process, Log Still brazenly used J.W. Dant marks as reference points in the design of its own marks. The person who designed the Log Still logo "tried to incorporate gold" so that the "font was an 85% match to the JW Dant one." PX 22 at 1. The "discovery workshop" for the Log Still brand recommended that the new logo's colors "mirror the original J.W. Dant label colors" by "[s]ticking with tradition without copying exactly." PX 24 at 10. For the Monk's Road label, "the script font that is used is the J.W. Dant script from the original label." *Id.* The marketing team discussed using the D for Dant in the 18-D-36 logo as "conceptually" related to the J.W. Dant "trademark symbol with the corn kernels," which "Wally likes." *Id.*; PX 26 at 2. Wally Dant also wanted to use Joseph Washington Dant on the labels "so that way no one could accuse of [*sic*] us…" PX 28 at 2 (ellipsis in original). But then he specifically asked that the "J the W and the Dant" be highlighted gold—apparently to make "Joseph Washington Dant" more closely resemble the original brand. *Id.*

Granted, Log Still did not ultimately adopt all these design ideas. But the discussion and design efforts show, plain as day, that Log Still tried to mirror classic J.W. Dant marks while avoiding the legal consequences of copying. Was this done with pure intentions, as Log Still contends? LS Opp. Br. at 49–51. The Sixth Circuit

has held that "intentional copying" exists if "the alleged infringer [Log Still], who has at least as much knowledge as the trier of fact regarding the likelihood of confusion, believes that [its] copying may divert some business from the senior user [Heaven Hill]." *Daddy's*, 109 F.3d at 286.  Here it's not clear that Log Still aimed to steal J.W. Dant sales, but it *is* clear that Log Still aimed to steal J.W. Dant's story—intentionally and in order to compete in the spirits marketplace.

The record includes still more reasons to doubt Log Still's pure intentions.

- The purposeful purchase and redirection of jwdant.com, for more than a year, to Log Still's own website.  *See* § II.B above.  *Res ipsa loquitur.*

- Wally Dant's incredible claim that the J.W. Dant in the URL referred to him, Dant, Tr. II at 136, even though the emails at issue expressly referred to Joseph Washington Dant, PX 30 at 3.

- Log Still knew that using "est. 1836" "might" raise concerns since Heaven Hill used that for J.W. Dant, PX 26 at 1, yet decided to put "EST. 1836" on its gin bottles and inside its prominent 18-D-36 logo.

- Log Still also knew that its use of the 1836 date was inaccurate, which is why one of its proposed taglines mentioned "putting barrels in bottles since 1836. *Sorta.*" PX 27 at 45 (emphasis added).

- The entire marketing plan rested on tying Log Still to the legacy of J.W. Dant by "reviving" or giving "rebirth" to a "legacy," "tradition," or "heritage"—always in reference to the old J.W. Dant history.  *See* PX 24 at 2, 5; PX 27 at 7, 11, 17; PX 32 at 6–8, 10–11; PX 48 at 2–4; Earnhart, Tr. I at 171–73 (importance of this story).

- The marketing team listed J.W. Dant, his bourbon, and his history as topics over which Log Still had the "authority" to address with credibility and expertise, indicating Log Still maintained its venture had wide latitude to discuss J.W. Dant.  PX 27 at 17.

- Log Still's social media posts, website, and even bottles included pictures of J.W. Dant logos or bottles and lines such as "A Legacy Worth Reviving." PX 13 at 7–13; PXs 16, 33, 34.  Log Still knew that Heaven Hill controlled this intellectual property, but used the images anyway in order to affiliate its new brand with Heaven Hill's existing one.

- To bring more attention to "the Dant family's revival," Log Still tried to gather more "Dant photographs," while cautioning that "we want to be sure that pictures do not overly promote J.W. Dant/Heaven Hill." PX 32 at 1.

- Log Still's marketing team knew that confusion was a risk before launch: "we may have to deal with possible confusion there.  Heaven Hill may see some pickup from that confusion." PX 24 at 7.

- Emails and marketing plans expressed concern that media discussion of J.W. Dant (the historical figure) in connection with Log Still's launch could increase demand for J.W. Dant (the Heaven Hill brand), which would naturally follow from confusion regarding the products' origin and affiliation.  PX 24 at 7; PX 29 at 1; PX 30 at 1–2; PX 31 at 1; PX 32 at 1.

Despite these concerns regarding confusion, Log Still proceeded to execute its Dant-themed marketing plan.  This supplies abundant and strong evidence of intent.  Other courts have found bad intent based on similar, but more limited, records.  *See, e.g.*, *Audi AG*, 469 F.3d at 543–45 (using www.audisport.com was evidence of bad intent because the owner knew he did not own the Audi brand); *Grubbs v. Sheakley Group*, 807 F.3d 785, 794, 797 (6th Cir. 2015) (including the company name in a URL conveyed by email represented intentional and bad-faith trademark use).  Log Still's use of the URL alone stands as powerful evidence of its intent, and here we have far more besides.

Wally Dant attempted to put at least some of this behavior in a better light by reiterating that J.W. Dant was, after all, his own name: John Wallace Dant III.  Dant, Tr. II at 136.  As discussed above, this is largely irrelevant as a question of basic trademark law: the question is confusion, not literalism.  *See* above at § III.A(2)(b).  As a factual matter, too, that explanation of Log Still's intent is tough to credit.  A great deal of evidence shows that Log Still often used J.W. Dant to refer to Joseph Washington the First, not John Wallace the Third.  When Lynne Dant—the head distiller—asked to use Joseph Washington instead of J.W. in a Facebook post, she wasn't thinking about her cousin.  PX 30.  Nor with respect to the domain name: "speaking of our ol' great-great J.W…. I believe we now own the URL JWDant.com…since we keep mentioning the name, can we go ahead and map that URL to logstilldistillery.com?"  *Id.* at 3.  Wally Dant was on this email thread and never indicated that his cousin didn't realize that J.W. actually referred to him.  *Id.*  This and other context clues cast serious doubt on Log Still's assertions of good faith.  *See, e.g.*, § III.A(2)(d) (gold lettering of J, W, and Dant on label).  This only strengthens the remaining evidence that Log Still intended to affiliate itself with J.W. Dant's goodwill to promote its own products.

### h.  Likelihood of expansion of the product lines

"[A] 'strong possibility' that either party will expand his business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing."  *Homeowners Group*, 931 F.2d at 1112 (citing Restatement of Torts § 731(b) & cmt. c (1938)).  An "expansion" may be either geographic or an increase in the types of products or services offered.  *See id.*; *Daddy's*, 109 F.3d at 287–88.  This is relevant if the parties are not already competitive, *Homeowners Group*, 931 F.2d at 1112, which Log Still and J.W. Dant already are, *see* § III.A(3)(b) above.

Regardless, expansion is rather obvious here, as both parties seem to recognize. Dant, Tr. I at 279–80, Tr. II at 82–83. Log Still's business plan is to grow its brand recognition and market presence, both by selling the bourbon Log Still distills itself, Dant, Tr. I at 279–80, Tr. II at 45 (the current product is sourced, not homegrown, as is common for new distillers), and by expanding geographically, including to many states where J.W. Dant is sold, *id*.; PX 24 at 6–8; PX 48 at 21. Monk's Road growth is already impressive, and nothing indicates it is likely to slow. Dant, Tr. II at 82–83, 116–18. Log Still also hopes to become a bourbon destination, bringing more tourists into a campus only a few miles from Heaven Hill's. PX 24 at 6–8; PX 48 at 21*;* PX 53 at 1. While Heaven Hill might not expand the J.W. Dant label in particular, the bourbon boom will likely cause some growth, especially in tourism. Shapira, Tr. I at 72, 94–95. Both parties, for example, will open restaurants for tourists. LS Opp. Br. at 36. Because they are competing over bourbon in an expanding market, this factor strongly favors Heaven Hill.

\* \* \*

Considering all eight factors, the evidence presented in the parties' submissions and at the preliminary-injunction hearing shows a strong likelihood of confusion.

This is an affiliation case in which a newcomer is building a brand by intentionally tying itself to an old brand and story controlled by a competitor. So Log Still's conception and execution of this plan to trade on another's good will—by "subtly tying the new distillery to the J.W. Dant name" through labels, distillery tours, social media, and the like—might by itself support a likelihood of confusion. PX 25; *Homeowners Group*, 931 F.2d at 1111 (bad intentions can suffice).

But intent is hardly the only factor that favors Heaven Hill. Even though Log Still has just opened, evidence shows confusion among consumers and members of the media that Log Still is the "original J.W. Dant distillery!" PX 21; *Daddy's*, 109 F.3d at 284 (actual confusion is "the best evidence of likelihood of confusion."). This indicates that Log Still's marketing plan has already had the desired effect of tying the brands' "stories." That is especially problematic given that Log Still and the J.W. Dant brand are related—competing for the same consumer base. So Heaven Hill is losing control of its brand among its target audience. And this will only get worse as Log Still expands in geographical reach and production. In addition, even though J.W. Dant is not heavily advertised, both parties use the same channels of distribution and similar marketing efforts to reach bourbon aficionados and other liquor consumers. These factors all weigh heavily in favor of Heaven Hill and are more than enough to conclude that Log Still's actions are likely to cause confusion.

The most significant factor in Log Still's favor is the relatively poor strength of J.W. Dant's marks, based on market-recognition evidence. And the logos and bottles are unlikely to confuse a consumer in a store based on any visual similarities. But

similarity matters less in an affiliation case, *Maker's Mark*, 679 F.3d at 421–22, particularly when the junior user set out to affiliate its product with an existing brand's goodwill.  So only two factors favor Log Still—and those only moderately.

The last factor, purchaser care, washes out for similar reasons: the relevant consumers span the spectrum of care, and even very sophisticated consumers may be confused by a potential association between similar products.  *See, e.g.*, *Champions Golf*, 78 F.3d at 1121.

Because most of the factors—including some of the most important, such as intent and actual confusion—heavily favor Heaven Hill, the Court finds that Log Still's conduct is likely to cause confusion and therefore that Heaven Hill is likely to succeed on the merits.

## B. Irreparable harm

When an infringer uses a mark it doesn't own, it "borrows the owner's reputation, whose quality no longer lies within his own control."  4 MCCARTHY § 24:14 (citing *Yale Elec. Corp. v. Robertson*, 26 F.2d 972, 974 (2d Cir. 1928) (Hand, J.)).  This loss of control is "an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask."  *Id.*; Shapira, Tr. I at 126–27 (testimony regarding loss of control).

And this sort of injury is usually considered irreparable.  Just last year Congress updated the Lanham Act to provide a "rebuttable presumption of irreparable harm upon … a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction or temporary restraining order."  15 U.S.C. § 1116(a), Pub. L. No. 116-260, 134 Stat. 1182, 2208 § 226(a) (2020).  This amendment followed several Supreme Court decisions on preliminary injunctions that led many circuits to conclude that an irreparable injury could *not* be presumed based only on a likelihood of success in a trademark-infringement case.  *See, e.g., Herb Reed Enterprises, LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1248–49 (9th Cir. 2013) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)).  In a trademark case, the "irreparable injury flows both from the potential difficulty of proof of plaintiff's damages, and also from the impairment of intangible values."  *Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 608 (6th Cir. 1991) (Wynn II) (quotation omitted).  So irreparable harm exists when the plaintiff "shows that it will lose control over the reputation of its trademark ... because loss of control over one's reputation is neither calculable nor precisely compensable."  *CFE Racing Prod., Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 596 (6th Cir. 2015) (quotation omitted).

Since Heaven Hill is likely to succeed on the merits, § 1116(a)'s presumption of an irreparable injury applies.  And the evidence here supports that presumption:

the record gives ample reason to believe Heaven Hill would no longer control the goodwill associated with its J.W. Dant brand if Log Still appropriates the story to sell and grow its own product line through advertising, product labeling, and tourism. §§ II.C, III.B.  The intangible interests in controlling the goodwill of one's brand are especially important in an affiliation case like this where the main infringing action is an attempt to redirect and "revive" the legacy of a brand.

Log Still argues that testimony from Heaven Hill's president and brand ambassador rebuts this presumption.  Both admitted they do not know of any instances of lost sales or consumer confusion other than the online posts discussed above.  Shapira, Tr. I at 180–81; Lubbers, Tr. I at 253.  Heaven Hill's president admitted on the stand that the company "hasn't been irreparably harmed at this point."  Shapira, Tr. I at 181:25–182:1–2.  But in context, this answer came after questions dealing with lost sales and consumers voicing confusion.  *Id.* at 180–82 .  Even assuming this amounted to a concession, however, that would not be dispositive in an infringement case.  *See Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 381–82 (6th Cir. 2006) (not requiring a particular finding of the likelihood of irreparable harm because harm to reputation follows from likely confusion).  In *Wynn II*, the Sixth Circuit followed the "proper approach" of "looking to the entire record rather than focusing on the concession."  943 F.2d at 603 (declining to accept concession regarding intent without further examination).  It is unsurprising that evidence of tangible direct harm has not surfaced since Log Still just recently opened to the public.  *See Maker's Mark*, 679 F.3d at 422.  And, as the witness pointed out, Heaven Hill has every reason to expect the early, limited instances of confusion to worsen if Log Still continues to expand using a marketing strategy that intentionally claims the legacy of J.W. Dant.  *Id.*; Dant, Tr. I at 279–80; *Daddy's*, 109 F.3d at 286 (intent indicates that the infringer "believes that his copying may divert some business from the senior user").

In any event, Heaven Hill does not need proof of lost sales to show irreparable harm; losing control over the brand and reputation of J.W. Dant can be enough if that loss is ongoing or imminent.  *CFE Racing Prod.*, 793 F.3d at 596; *Sumner County Schools*, 942 F.3d at 327.  Heaven Hill's president testified that it has already lost at least some control of its brand, its reputation, its legacy, and goodwill thanks to Log Still's appropriation of that material: "If we let the control of our brand, the control of the history and heritage of our brand slip away, we're really in real danger of losing control over the entire brand." Shapira, Tr. I at 127.  Given the evidence of an ongoing and serious injury to Heaven Hill's control of the goodwill and reputation of its brand, it is difficult to say that Heaven Hill has not shown an irreparable injury—much less that Log Still has carried its "heavy" burden of rebutting the statutory presumption of such an injury.  5 MCCARTHY § 30:47.

Log Still raises two equitable defenses to argue that it has rebutted the presumption of irreparable harm.  Neither is persuasive based on the preliminary-injunction record.

*First*, in a type of laches argument, Log Still argues that Heaven Hill's delay in bringing this case and allowing time to conduct discovery shows a lack of irreparable harm. According to Log Still, its activities have been open and compliant with Heaven Hill's objections, leaving Heaven Hill no reason to wait to file this suit while Log Still continued to invest millions. *See* LS Opp. Br. at 53.

While Log Still may have operated in the open, it did so only since its 2018 establishment and its 2021 public launch. Heaven Hill didn't sit on its hands during that period; it warned Log Still not to infringe on its marks, sent several cease-and-desist letters, and successfully challenged Log Still's attempt to trademark Dant & Head. PXs 8, 9, 12, 13. Equity doesn't demand that Heaven Hill lead with its high trump. And the Court won't punish Heaven Hill for opening with an approach less drastic than an expedited federal-court injunction before Log Still began to execute (or even develop) its marketing plan. *See Wynn II,* 943 F.2d at 608 (two-year delay in sending cease-and-desist not barred by laches because (among other reasons) the plaintiff sued within the statute of limitations); *Ameritech*, 811 F.2d at 963 (no laches defense after much advertising and 6-month delay based on "strong presumption that laches do not bar an action before the running of the analogous statute of limitations").

*Second*, Log Still argues these claims are estopped because Heaven Hill itself uses the Beam name without permission and allows Limestone Distillery to discuss J.W. Dant. LS Opp. Br. at 27, 52; Tr. I at 34:6–15, 129–137, 177–78; DX 30–36. But Log Still points to nothing in which Heaven Hill or Limestone purports to "revive" the Beam or Dant legacy; neither example approaches the level of intentional association and commingling evident in this record. Instead the information cited by Log Still merely discuss the historical reality that several members of the Beam family worked for Heaven Hill as master distillers, Shapira, Tr. I at 129–37; DX 33–34, 63, and that J.W. Dant played a role in the bourbon industry that led to Limestone Distillery's creation, DX 35. This is precisely the type of non-trademark use discussed in *Hensley*, 579 F.3d at 610–11, and *Sazerac*, 892 F.3d at 859, in which a company accurately describes its associations with specific people and places. Even assuming these limited examples amounted to infringement, moreover, Log Still cites no authority indicating that would suffice to forfeit Heaven Hill's legal rights or bar this Court's remedial authority.

Based on this evidence of loss of control, Heaven Hill retains and even strengthens the presumption of irreparable harm that law affords an owner whose marks have been infringed.

## C. Public interest

Trademark law is by its nature focused on the public's interest in ensuring that consumers know what they are purchasing and can make informed decisions. *See* 1 MCCARTHY § 2:22. "An important beneficiary of the trademark system is the public,"

which "has a great interest in administration of the trademark law in a manner that protects against confusion." *Guthrie Healthcare System v. ContextMedia, Inc.*, 826 F.3d 27, 50 (2d Cir. 2016). A violation "inhibits competition," but also "deprives consumers of their ability to distinguish among the goods of competing manufacturers." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 854 n.14 (1982). Indeed, the Sixth Circuit has held that an injunction against counterfeits "advance[s] two fundamental purposes of trademark law: preventing consumer confusion and deception in the marketplace and protecting the trademark holder's property interest in the mark." *Lorillard Tobacco*, 453 F.3d at 383.

The evidence of actual consumer confusion already in the record substantiates that concern in this case. *See* above at § III.A(3)(d). And that evidence suggests the risk of confusion will only increase as Log Still grows. The purchasing public has a clear interest in not being confused or led astray.

Log Still's only response is that an injunction would hurt competition without any corresponding benefit because it doubts Heaven Hill is likely to succeed on the merits. Obviously this Order rejects that premise. And even assuming that requiring Log Still to alter its marketing equates to a diminution in competition, the goal of trademark law is not unfettered competition; it is non-misleading and non-confiscatory competition. *See Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir. 1998). The public has no legitimate interest in any benefits of unfair competition. *W. Point Mfg. Co. v. Detroit Stamping Co.*, 222 F.2d 581, 599 n.2 (6th Cir. 1955) (Trademark law "is a branch of the broader law of unfair competition."). So the public interest favors an injunction for Heaven Hill.

## D. Substantial harm to others

"Where the burden of the injunction would weigh as heavily on the defendant as on the plaintiff, the plaintiff must make a showing of at least a 'strong probability of success on the merits' before a trial court would be justified in issuing the order." *Frisch's*, 759 F.2d at 1270 (quotation omitted). Heaven Hill has made that showing here. And when a senior user is likely to succeed on the merits, then the law shows less concern for a temporary injunction's potential harms to an infringer: the lost profits from and investments in infringing activity, which the infringer never had any right to. *See Lorillard*, 453 F.3d at 382 (the "harm" suffered by an infringing trademark defendant is "hardly a legally cognizable one"); *Cent. Benefits Mut. Ins. Co. v. Blue Cross & Blue Shield Ass'n*, 711 F. Supp. 1423, 1435 (S.D. Ohio 1989).

"A party who willfully proceeds to expend funds on infringing activities cannot claim the loss of those funds as a ground for denying preliminary injunctive relief." *Worthington Foods, Inc. v. Kellogg Co.*, 732 F. Supp. 1417, 1461 (S.D. Ohio 1990). Log Still has already invested $30 million into the distillery, with plans to spend more. Dant, Tr. II at 145–46. The head of marketing estimated that complying with an injunction could cost $1 million. Earnhart, Tr. II at 190–91. Plus the company could

lose revenues from business disruptions and negative press.  Dant, Tr. II at 146–47.  Wally Dant estimated that this could set their project back months.  *Id.*  Worst case scenario, the distillery could shut down and lay off employees.  *Id.*

But much of this is self-inflicted, or at least knowingly risked.  Log Still invested a tremendous amount of money, time, and effort into an impressive enterprise.  But it did so without assurances regarding the limits of trademark law and Heaven Hill's patience.  And, as far as the record reveals, it did so without a contingency plan.

To be sure, Log Still certainly has a product and story of its own to sell, as well as a claim—albeit limited by law—to the Dant family's history and honor.  But equity accounts for those considerations in shaping the remedy, not by denying an injunction in the first place.  *See Basile*, 899 F.2d at 39; *Hustler*, 810 F.3d at 427 ("[T]he scope of the injunction accounts for the reality that the mark relates to the offending party's own last name.").  Given the irreparable harm to Heaven Hill and the self-inflicted nature of some of the potential harms to Log Still, the balance of the equities decisively favors an injunction.

## IV.    Remedy

The temporary injunctive relief available to Heaven Hill stems from the Lanham Act and Rule 65 of the Federal Rules of Civil Procedure, both of which incorporate familiar limits on the Court's equitable powers.  15 U.S.C. § 1116 (courts "shall have power to grant injunctions, according to the principles of equity"); *S. Milk Sales, Inc. v. Martin*, 924 F.2d 98, 102 (6th Cir. 1991) (looking "to general equitable principles in" assessing "the appropriateness of granting a preliminary injunction").  So any injunction must be "no broader than necessary to cure the effects of the harm caused by the violation" in order to avoid "unnecessary burdens on lawful activity." *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 72 (2d Cir. 2016) (quotations omitted); *see also Sharpe v. Cureton*, 319 F.3d 259, 272–74 (6th Cir. 2003).

As discussed above, courts take special care in crafting injunctions that "serv[e] to limit an individual's use of his own name in a business that he has nurtured." *Joseph Scott Co. v. Scott Swimming Pools, Inc.*, 764 F.2d 62, 67 (2d Cir. 1985).  Bad faith in using a name, however, can favor a more sweeping injunction.  6 CALLMANN ON UNFAIR COMP., TR. & MONO. § 22:57–58 (4th ed. 2021).  Particularly if the user trades on goodwill in a brand that was sold to the plaintiff.  *See Levitt*, 593 F.2d at 468–69.  Many such injunctions have required a change in the name (such as adding initials), changes to the style of the name, and a disclaimer.[14]

---

[14] *See, e.g.*, *Waterman*, 235 U.S. at 91–98 (requiring use of "Arthur A. Waterman & Co.," not just "A. A. Waterman & Co.," and disclaimer "not connected with the L. E. Waterman Co."); *Taylor Wine*, 569 F.2d at 736 (barring use of last name as trademark, but allowing use

Appropriate preliminary relief in this case balances Heaven Hill's right to control its marks and goodwill, Log Still's intentional use of that material, and the Dants' interest in pursuing their family business through the distillery they founded. The parties' supplemental briefs on injunctive relief discuss many interrelated aspects of Log Still's business and communications, and the temporary relief afforded here is designed to address these multifaceted requests while disrupting as little as possible during this litigation. As indicted by the caselaw citations below, moreover, the nature of the relief granted Heaven Hill accords with many instructive trademark precedents from inside and outside the spirits industry.

Mindful of those competing considerations, therefore, the Court **GRANTS IN PART** Heaven Hill's motion for a preliminary injunction and **ORDERS** Log Still to stop using the goodwill associated with the J.W. Dant brand to promote its spirits and services by taking these steps:

## A. Products, labels, and logos

1. Log Still must remove references to J.W. Dant and his story from its products, labels, and logos. *See, e.g., K. Taylor*, 31 F. Supp. at 614–16.

2. Log Still must remove references to the year 1836 from its products, labels, and logos since its use implies an ahistorical connection to the J.W. Dant brand. *See vonRosenberg*, 429 F. Supp. 3d at 182–85.

3. Log Still needn't destroy, recall, or relabel existing products that it has already labeled or branded due to Heaven Hill's agreement, Tr. II at 214–18, and the cost and complications involved. The relabeling required by this Order will apply prospectively to any new bottle produced by Log Still.

4. The parties shall confer and update the Court regarding a timeline for rebranding, specifically addressing the timing and process for any federal label approval, *see* Tr. II. at 148–49, 156–57, as well as the amount and nature of the infringing products and services that will remain on offer.

## B. Marketing

1. Log Still may not use the jwdant.com domain in connection with any aspect of the spirits industry. *See generally Audi*, 469 F.3d at 543–45.

2. Log Still must remove any social media, web, advertisement, or other marketing or communications content that promotes its spirits by

---

of signature and personal story adjacent to disclaimer); *Hustler*, 810 F.3d at 426–28 (barring brother from using last name Flynt "in connection with the sale, promotion or advertising of adult entertainment products or services unless it is accompanied by the first name 'Jimmy' in the same font size, color, and style and on the same background color" and a disclaimer regarding his brother's brand).

stating or implying that Log Still is reviving, preserving, or contributing to the legacy of J.W. Dant's distilling and the company he founded and his descendants sold. *K. Taylor*, 31 F. Supp. at 614–16.

3. Log Still needn't eliminate all references to the history of J.W. Dant and the current Dants' familial connections with him on their tours, website, social media, or campus. But such references must include a conspicuous disclaimer that Log Still does not own and is not affiliated with the J.W. Dant brand, which previous generations sold and is now owned by an unaffiliated company. *See, e.g., L.E. Waterman Co.*, 235 U.S. at 96; *Taylor Wine*, 569 F.2d at 736.

4. Log Still must use Joseph Washington Dant's full name, as opposed to J.W. Dant, when discussing his story, company, or legacy. *Id.*

5. Log Still and members of the Dant family involved in Log Still may refer to the current family members' involvement in the new venture as long as they don't use the initials J.W. out of context and explain their names and associations in an accurate and non-misleading manner. *Id.*

## C. Dant Crossing

1. Log Still may continue to refer to its campus as Dant Crossing, given the property's historical ties to the Dant family and the term's descriptive nature. But Log Still may not take steps to further affiliate the campus name with the marketing and offering of the spirits distilled there under different brand names. *See Sazerac Brands*, 892 F.3d at 857. To the extent the Dant Crossing name is used in connection with the original J.W. Dant and the marketing of spirits, Log Still must use a disclaimer.

2. Log Still must remove the Dant Distillery Company stencils from the barrels and refrain from using that common-law trademark in other commercial ways.

## D. Bond

1. The parties must confer regarding a potential bond amount from Heaven Hill, consistent with Fed. R. Civ. P. 65(c), and submit their joint or (if necessary) respective positions within 10 days of the entry of this Order.

Benjamin Beaton, District Judge

United States District Court

cc:    Counsel of Record

December 16, 2021